ROGERS, Justice.
 

 On October 1, 1942, Dr. Pascasio Quinones, a member of the Medical Corps of the United States Army, was' accidentally killed when a military plane in which he was riding crashed into a mountainside near the City of San Juan, Puerto Rico. At the time of his death Dr. Quinones held a life insurance policy for $20,000, issued by the Life and Casualty Company of Tennessee in which the six minor children of the deceased were named as beneficiaries. In this suit Mrs. Quinones, as tutrix and on behalf of her minor children, is seeking to recover the amount of the policy from the life insurance company.
 

 Answering plaintiff’s suit, the defendant insurance company set up two alternative grounds of defense under both of which the company denied liability for the principal sum stipulated in the policy. Under the first ground of its defense, the defendant insurance company, relying upon the aviation clause of the policy, admitted liability for $190.80, the amount of the reserve on the policy. Under the second ground of its defense, the defendant company contended that because of the military, naval and air service clause contained in the policy its liability was limited to one-fifth of the amount payable under the insurance contract, namely $4,000, less the unpaid premium for the remainder of the first year amounting to $206.80, or a net amount of $3,793.20.
 

 Judgment was rendered in favor of plaintiff for the full amount of the policy with interest, and the defendant insurance company has appealed from the judgment.
 

 The aviation clause of the policy on which the defendant insurance company relies as the first ground of its defense reads as follows : “Aviation. Should the death of the Insured result from operating, or riding in, any kind of aircraft, except as a fare-paying passenger in a licensed passenger aircraft operated by a licensed pilot on a regular passenger route between definitely established airports, only the reserve under this Policy shall be payable and said reserve shall be in full settlement of all claims hereunder.”
 

 The defendant insurance company argues that at the time Dr. Quinones was killed he
 
 *81
 
 was not riding as a fare-paying passenger on a licensed passenger airplane, operated by a licensed pilot on a regular passenger route between definitely established airports, and therefore the full liability of the defendant insurance company under the terms of the policy is only $190.80, the reserve on the policy.
 

 The record discloses that at the time of his death Dr. Quinones was a passenger on an airplane regularly operated by the United States Government between Borinquin Field and the City of San Juan. The plane carrying Dr. Quinones and nineteen other persons, three of whom were civilians, left Borinquin Field for Losey Field and to go from there to San Juan. It crashed at a point between Coamo and Orocivis, Puerto Rico, killing all the occupants. The plane was of the type carrying a civilian designation of DC-2, made by the Douglas Aircraft Corporation, many of which were used before the war by commercial airlines for passenger transportation. These planes were requisitioned by the Army, designated as C-39, and, with some minor alterations, were used to carry both passengers and cargo. The plane involved in this case had been in operation for approximately eighteen months on a regular schedule between the airfields located at Borinquin and San Juan, with an intermediate stop at Losey Field, Puerto Rico. Those airfields compare favorably with civilian airfields located in the United States and, in fact, the airfield at San Juan was used by the Pan-American Airways in conjunction with the Army and the Navy. The pilot was an experienced pilot, and he had piloted passenger planes at Borinquin Field for at least one and a half years prior to the fatal accident. The passengers were members of the Armed Forces of the United States and such civilians as it was considered necessary in the interest of those in the Armed Forces to transport. All the passengers were furnished with slips of paper signed by the operations officer in the name of the commanding officer of the field, giving them permission to ride on the plane. At the time he lost his life, Dr. Quinones, who was stationed at the base hospital at Borinquin Field, was making the trip to San Juan under military orders for the purpose of securing some serum and also, as he was authorized to do, for the purpose of attending to some personal matters. He enjoyed the privilege of traveling by airplane, by government car or by train. If he had chosen to travel by train, the Army would have furnished him a railroad ticket.
 

 It is unquestionably correct, as argued by counsel for the defendant insurance company, that limitations of liability contained in insurance policies are recognized and enforced by the courts. But the controlling question in this case is whether, under a proper interpretation of the language used to identity the class of persons embraced within the exceptions to the general rule of exclusion embodied in the contract, Dr. Quinones, the insured, can be considered as coming within the exceptions so as to permit plaintiff to recover on the policy.
 

 It is contended on behalf of the defendant insurance company that the aviation clause is couched in clear and unambiguous
 
 *83
 
 language and that there is no uncertainty as to its meaning. Under the clear language of the clause, there can he no recovery in this case because the death of Dr. Quinones, the insured, occurred while he was riding as a non-fare-paying passenger, on a non-licensed military plane, operated by a non-licensed army pilot on a military mission in time of war, between army air bases not open to civilian planes and within a military zone.
 

 But, as correctly pointed out by the trial judge in his well-considered written reasons for holding the defendant insurance company liable on its policy:
 

 “There is nothing in the aviation clause of this policy which limits the coverage to Civilian as distinguished from Military planes. The airports in this case were ‘definitely established airports.’ The route was a ‘regular passenger route.’ The airplane was a ‘licensed passenger aircraft,’ and it was operated by ‘a licensed pilot,’ in the sense that both were approved, authorized and licensed by the Army. There is nothing in the aviation clause which restricts the ‘licenses’ to those which are issued by any particular governmental agency or agencies. There is nothing to indicate that Army ‘licenses’ or permits are not sufficient. The only serious question is whether Dr. Quinones was a ‘fare-paying passenger’ within the meaning of the aviation clause. He undoubtedly was a passenger, but in a narrow and restricted sense, it may be said that he did not pay his fare but was riding on a pass. But there is nothing in the aviation clause which requires that he pay his own fare. A passenger whose fare is paid directly or indirectly by his employer is certainly ‘a fare-paying passenger.’ -In the law of carriers, passengers who ride on passes are universally placed in the same category as those who pay their fare. Without doubt the members of the military personnel who are being transported about the country from camp to camp and whose fares are being paid to private carriers by the Army, are fare-paying passengers within the meaning of the law. If the Army goes a step further, as it did here, and itself transports its personnel, at its expense, in lieu of paying their fare to private carriers, the members of this personnel may still be said to be fare-paying passengers in the broadest use of that term. Indeed, in the instant case, * * * if Dr. Quinones had proceeded by rail instead of by airplane, the Army would have procured for him a paid railroad ticket.
 

 “In the construction of the aviation clause in this policy the Court should also give consideration to the probable intention of the parties, and take into account the recent development of the airplane as a recognized means of safe transportation.
 

 “It seems fair to conclude that it was the intention of the parties in this case to exclude from the coverage guests, trespassers and plane crews, and the hazards incident to private flights, unscheduled special trips and landings at places other than regular airports. It seems equally fair to conclude that it was not their intention to exclude military as distinguished from civilian airlines where all other conditions of the policy are substantially met, nor to distinguish between a passenger whose fare
 
 *85
 
 is paid directly or indirectly, or absorbed, by his employer and a passenger who pays directly his own fare.
 

 “Since travel by air is as safe today as any other mode of transportation, there is no reason why a clause relating to aviation should be more strictly construed than a similar clause relating to transportation by rail, by motor car or by horse and buggy.
 

 “It is interesting to note that in reply to an inquiry by the defendant, the Adjutant General of the United States advised the defendant that ‘at the time of death Lieutenant Quinones-Chacon was a fare-paying passenger in a licensed passenger aircraft operated by a licensed pilot on a regular passenger route between definitely established airports.’ While this opinion of the Adjutant General is not binding on the Courts, since it is merely his conclusion from the facts, it does confirm the - fact that the language of this policy is open to that construction.
 

 “Under the rule that the aviation clause must be liberally construed in favor of the insured, Doctor Quinones was to all intents and purposes a fare-paying passenger in a licensed passenger aircraft operated by a licensed pilot on a regular passenger route between definitely established airports.”
 

 We have been referred by counsel for the defendant insurance company to the cases of Krause v. Pacific Mut. Life Ins. Co. of California, 141 Neb. 844, 5 N.W.2d 229, and Hyfer v. Mutual Life Ins. Co., 318 Mass. 175, 61 N.E.2d 3, as dealing with analogous situations.
 

 The facts in the Krause case, which was decided by the Supreme Court of Nebraska, are not precisely in accordance with the facts of this case. There the insured was traveling on a trip pass which on its face contained, among other stipulations waiving his rights as a passenger, the stipulation that [141 Neb. 844, 5 N.W.2d 232] “the user expressly assumes all risk of accidents, and of personal injury, and loss or damage to property, regardless of their causes, and absolves the company from all liability therefor.” A reading of the decision indicates it was mainly because of the decedent’s agreement to assume all risk of accidents and of personal injuries and to absolve the company from all liability therefor that the court held the decedent could not be justly considered as actually riding on the airplane as a “fare-paying passenger.”
 

 The Hyfer case was decided by the Supreme Judicial Court of Massachusetts. In this case the insured enlisted in the Army and was assigned to the Air Corps in which he held the rank of private. His principal duty was that of a radio operator on an official army transport plane. While on a* scheduled flight in Puerto Rico, where he was apparently stationed, the insured and the entire crew were killed by crashing into a hilltop obscured by the clouds. The policy contained an “aeronautical clause” couched in language similar to the language of the aviation clause contained in the policy in this case. In a very short opinion the court, applying the rule of strict construction, held that no recovery could.be had of the face of the policy in view of the aeronautical clause, as the insured was not a fare-paying passen
 
 *87
 
 ger on a licensed aircraft on a scheduled passenger air service regularly offered between specified airports.
 

 The Hyfer case is distinguishable from this case. In that case it was shown that the plane in which the insured was riding when he was killed was not a passenger plane. It carried a regular crew and the insured was a member of the crew, and the plane was not operated on a regular passenger schedule between established airports.
 

 The military, naval and air service provision of the policy on which the defendant insurance company relies as the second ground of its defense reads as follows: “Military, Naval and Air Service. The liability of the Company shall be limited to the reserve on this Policy, or to one-fifth of the amount payable hereunder on the death of the Insured, whichever is the greater, if the Insured should die while enrolled in military, naval or air service in time of war, whether declared or undeclared; or if the Insured should die as the direct or indirect result of such service, without securing a permit signed by an executive officer of the Company and paying such extra premium as the Company may fix to cover the hazard. Any indebtedness on or secured by this Policy, shall be deducted from the amount otherwise payable.”
 

 The defendant insurance company contends that under the provisions of the military clause its liability for the death of Dr. Quinones can in no event exceed one-fifth of the face of the policy since his death occurred while he was enrolled in military service in time of war. It is argued on behalf of the defendant that the military clause is a status clause and that the status of the insured as a member of the military forces in time of war is controlling, and that his death during such period of time entitles the beneficiaries only to such amount as is prescribed in the policy.
 

 Plaintiff’s answer to defendant’s contention is, — first, that the defendant is estopped to claim the benefit of the military clause, because, at the time the application of Dr. Quinones for the policy was made and approved and the policy issued, the defendant had positive knowledge that the insured was a member of the Armed Forces of the United States; secondly, that in issuing the policy while possessed of such knowledge was tantamount to the granting by the insurance company of the permit called for by the military clause at the premium rate fixed by the company and paid - by the insured; and thirdly, that under a fair and equitable interpretation the clause contemplates that the death of the insured must be the result of war activities and not as the result of activities which do not increase the usual hazards to which human beings are subjected.
 

 It will appear from the mere reading of the military clause that its provisions were intended to operate in the event the insured enrolled in the military service in time of war as well as in case of his death resulting from such service. But the clause does not provide that there shall be unconditional limited liability in the event the insured enrolls in the military, naval or air service. It provides that there shall be such limited liability only in the event the insured shall
 
 *89
 
 enroll in such service without securing permission to do so from the insurance company, and without paying such additional premium as the company may fix to cover the extra hazard.
 

 The liability of the defendant insurance company in this case turns upon the question of whether or not the insured, with the implied if not the express permission of the company, was enrolled in the military service in time of war.
 

 It is not disputed, and it can not be disputed, that at the time Dr. Quinones made his application for the policy sued on he was already enrolled in military service in time of war. The application for the policy is made a part of the contract between the parties. In answer to the ninth question appearing on the application, Dr. Quinones expressly advised the defendant insurance company that he was serving as a lieutenant in the Medical Corps of the United States Army. At that time, the United States was at war with Germany and Japan and their satellites. The defendant insurance company, therefore, accepted the application of Dr. Quinones and issued its policy to him with full knowledge of the fact that he was enrolled in military service in time of war. In so doing, it granted Dr. Quinones the permit required by the military clause. When defendant insurance company named the premium to be paid by Dr. Quinones, it fixed the premium it was willing to accept considering his age, health and military status. If the company intended to require any additional premium because Dr. Quinones was in the military service, it was incumbent upon the company to fix that premium at the time it issued the policy, because at that time Dr. Quinones was already in the military service. As is correctly stated by the trial judge: “When the insured’s offer was accepted, he had the right to assume that the entire premium for a $20,000 policy covering his life while he was enrolled in the military service was $103.40 per quarter. If the insurer intended it to be otherwise, it should have issued the policy in the sum of $4,000 and inserted a clause providing for a coverage of $20,000 upon the release of the insured from the military service. That the attention of the company’s officials was called to the status of the insured as one enrolled in the military service is made clear by the fact that his request for double indemnity was denied, as shown by the written inscription made upon the application.”
 

 The general rule on the question of estoppel and waiver in cases of this kind is stated in Couch on Insurance, Vol. 6, sec. 1242, pp. 4547, 4548, as follows: “Provisions exempting the insurer from liability under the so-called military clause may, like other provisions which are inserted in policies of insurance for the benefit of the insurer, be waived by it so as to render it liable for injury or death arising from entry into or engagement in warlike operations, as if no such provision were in the contract.”
 

 In James v. Community Burial Service Corp., decided by the Court of Appeal for the Parish of Orleans and reported in 5 La. App. 633, the policy contained a provision exempting the insurance company from liability for the death of the insured occurring outside the City of New Orleans. He died
 
 *91
 
 in the Parish of Plaquemines and the insurance company denied liability on the ground the conditions of the policy had not been complied with. The record disclosed that the agent of the company wrote the address of the insured on his application card as being in the Parish of Plaquemines. The court held that the defendant insurance company having knowledge of the fact giving it a contractual right to avoid liability, waived that right by accepting a premium or assessment. The court, in its opinion, cited as authority for its ruling the case of Gitz Sash Factory v. Union Insurance Co., 160 La. 381, 107 So. 232, where this Court held acts of officers and agents of insurance companies within the apparent scope of their powers are binding on the company, and the company may be estopped by their conduct and declarations. Cited also is the case of Lawrence v. Penn Mutual Life Insurance Co., 113 La. 87, 36 So. 898, 1 Ann. Cas. 965, where this Court held that by accepting the insured’s note instead of cash for the first premium the company waived the clause in the policy providing that the policy did not take effect until the first premium should actually have been paid. One of the cases cited in the opinion is the case of Sheldon v. Conn. Mut. Life Insurance Co., 25 Conn. 207, 65 Am.Dec. 565, holding the insurance company bound by its waiver of payment of the premium as stipulated in the policy and compelling it to comply with its obligation as if prepayment had been made as required by the contract. Thus, in this case, the defendant insurance company must be held bound by its waiver of the provisions of the policy with respect to military service in time of war when it accepted Dr. Quinones’ application and issued him a policy in the sum of $20,-000 upon the payment of a quarterly premium of $103.40, at a time it had full knowledge of the insured’s enrollment in the military service while this country was engaged in war.
 

 On this phase of the case we have been referred by counsel for defendant to the case of Life & Casualty Ins. Co. v. McLeod, 70 Ga.App. 181, 27 S.E.2d 871; Lindsey v. Life & Casualty Ins. Co., 70 Ga.App. 190, 27 S.E.2d 877; Miller v. Illinois Bankers’ Life Ass’n, 138 Ark. 442, 212 S.W. 310, 7 A.L.R. 378; Olson v. Grand Lodge, 48 N.D. 285, 184 N.W. 7, 15 A.L.R. 1270; Slaughter v. Protective League Life Ins. Co., 205 Mo. App. 352, 223 S.W. 819; Reid v. American Nat. Assur. Co., 204 Mo.App. 643, 218 S.W. 957. We do not regard any of the cited cases as authority contrary to the views we have expressed in this case. In all the cited cases the insured was a civilian at the time the policy was issued and his death occurred after he was enrolled in the military service. The case of Reid v. Insurance Company was decided by the Springfield Court of Appeals of Missouri, but in the case of Long v. St. Joseph Life Ins. Co., Mo.App., 225 S.W. 106, decided by the Kansas City Court of Appeals of the same State, the court expressed views in utter conflict with those expressed by the Springfield Court in the Reid case. In deciding the Long case, in favor of the insured, the Kansas City Court held that where a clause of a life insurance policy, as a war clause, is reasonably open to more than one interpretation, the one favorable and the other less favorable to the in
 
 *93
 
 sured, that most favorable to the insured must be adopted.
 

 We find no error in the judgment of the district court.
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 O’NIELL, C. J., takes no part.