## GRIMES et al. v. NEW YORK LIFE INS. CO.
### No. 5942.

United States District Court
E. D. Pennsylvania.
July 7, 1949.

Thomas B. K. Ringe, W. Heyward Myers, Jr., J. Wesley Oler, Philadelphia, Pa., for plaintiffs.

H. S. Baile, J. S. Conwell, Philadelphia, Pa., for defendant.

McGRANERY, District Judge.

This matter is before the Court on a motion for summary judgment by the defendant.

The facts briefly are that defendant, New York Life Insurance Company, a corporation of the State of New York, issued, on July 9, 1943, a policy of life insurance in the face amount of $50,000 to the insured, David Grimes, a resident of this district. Prior to the date of the insured's death, there had been paid one premium in the amount of $5,627.00. The

policy provided that when it became a death claim it would be payable to the defendant company as trustee under two separate trust agreements, with the insured's widow, the plaintiff, Cecyl H. Grimes, as the first beneficiary; but if the total proceeds amounted to less than $6,000, then the whole sum was to be paid to the first beneficiary, if living.

The insured, David Grimes, was vice-president in charge of engineering for the Philco Corporation. The corporation and the Navy Department of the United States entered into a contract whereby Philco Corporation was to furnish the services of one hundred skilled radio-radar engineers who were to act. as advisers concerning airborne equipment at places designated by the government contracting officer. In consideration of Philco Corporation furnishing these engineers and' services, the government agreed to pay the Philco Corporation up to $755,366 computed on a basis of $694.-17 a month per engineer, plus an average of $250.00 a month per engineer for actual transportation costs and $5.00 a day per engineer during the period of such engineer's assignment to duties outside the United States.

It was under this contract that the services of Mr. Grimes were made available by the Philco corporation to the United States Navy, which directed him to proceed to London "by commercial and/or government aircraft". On September 4, 1943 he arrived at the Naval Operating Base, Londonderry, located in Northern Ireland, and requested transportation to London. That day Commodore James A. Logan, the commanding officer of the base, had planned to fly to London for a conference there with Admiral Stark. The flight was arranged for by the United States Army, and an Army plane was sent to Eglington Field, North Ireland, from Hendon Field in England for that purpose. The route of the flight was to be from Eglington Field to Hendon, England, via Langford Lodge, Ronaldsway, Rhyl and Droitwich.

The insured requested and received official permission to accompany Commodore Logan on the flight. At the time Eglington Field and Hendon Field were both airfields under military control. The plane used for the flight had the Army designation UC-78, it being a two-motor transport type plane with seats for pilot and co-pilot and a rear seat for two or three passengers. It was piloted by an Army Air Forces Captain and had been assigned by the Army to the 86th Air Transport Squadron 27th Air Transport Group, 8th Air Forces Strategic Command.

The plane carrying the Commodore and the insured as passengers took off from Eglington Field at about 2:30 P.M. on September 4, 1943 and at approximately 2:48 P.M. that day it crashed into the side of a mountain. In this crash the insured, David Grimes, went to his death.

On or about October 1, 1943, proofs of death were filed by plaintiffs. On June 20, 1944 the defendant insurance company tendered to the plaintiff Cecyl H. Grimes, widow of the insured, the sum of $5,786.73 as the restricted amount due under the policy. The tender was refused and suit commenced to compel payment of the full face amount under the terms of the policy.

The issues are raised by the language contained in the policy:

"The only amount payable under this Policy shall be the restricted amount hereinafter defined if the death of the Insured shall occur * * *

"or (3) as a result of operating or riding in any kind of aircraft, whether as a passenger or otherwise, other than as a fare-paying passenger of a commercial airline and flying on a regularly scheduled route between definitely established airports;

"or (4) within two years from the date of the issue of this Policy as a result of war, provided the cause of death occurs while the Insured is outside the Home Areas and the Insured dies either outside the Home Areas or within six months after returning to the Home Areas."

The "restricted amount" is defined to be:

"* * * a sum equal to the premiums which shall have fallen due hereunder prior to the date of death of the Insured and been paid to and received by the Company, together with compound interest at the rate of three per cent per annum * * *."

Defendant here moves to have summary judgment entered for the restricted amount as tendered, on the ground that the insured met his death under circumstances relieving the company of liability for the face amount by virtue of the "aviation exclusion" clause and the "result of war" clause.

The issues here involved, therefore, are: Did the insured meet his death while riding in an aircraft otherwise than "as a fare-paying passenger of a commercial airline and flying on a regularly scheduled route between definitely established airports", and did his death occur "as a result of war" within the meaning of the policy?

On a motion for summary judgment, the issue presented is whether the pleadings, admissions on file and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Federal Rules of Civil Procedure, rule 56, 28 U.S.C.A. "Stated conversely, a substantial dispute as to a material fact forecloses summary judgment." Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 1942, 130 F.2d 1016, 1018. The burden of showing the absence of a genuine issue of material fact is upon the moving party, and all doubts as to the existence of such an issue must be resolved against him. Toebelman v. Missouri-Kansas Pipe Line Co., supra; Walling v. Fairmont Creamery Co., 8 Cir., 1943, 139 F.2d 318; Weisser v. Mursam Shoe Corp., 2 Cir., 1942, 127 F.2d 344, 145 A.L.R. 467. Further, it is unnecessary to cite authority for the familiar rule that any ambiguities in the language of an insurance policy are to be resolved against the insurer.

With respect to the aviation exclusion clause, above quoted, it cannot be said that there is a complete absence of a genuine issue of material fact, even though such issues as exist may be easily resolved upon trial. As counsel have pointed out, the exception to the exclusion clause may be considered in four elemental parts: (1) that relating to "a fare-paying passenger"; (2) that relating to a "commercial airline"; (3) that relating to a "regularly scheduled route"; and (4) that relating to "definitely established airports". If the circumstances of the insured's death failed in any single respect to fit into the exception, summary judgment for the defendant would be granted. However, I am of the opinion that contradictions of fact appear in each of the four issues:

(1) The defendant, in support of its motion, has filed several affidavits of witnesses stating that the insured paid no fare for transportation and that there was no charge made, directly or indirectly, by bookkeeping entry or otherwise, for such transportation. Some of these affidavits, however, were made on information and belief; and the defendant's affiant, Admiral Stark, acknowledged, in a counter-affidavit, that his prior affidavit, which appears to be on personal knowledge, was actually intended to be on information and belief only. The statements of fact on personal knowledge smack of conclusions. Particularly is this so in view of the contract provision, above referred to, relating to the transportation costs of the civilian engineers. In this connection Quinones v. Life & Casualty Ins. Co. of Tennessee, 1945, 209 La. 76, 24 So.2d 270, is pertinent, to the extent that it demonstrates the possibility of an indirect payment of fare, even for military personnel transported in military aircraft, in the absence of a cash or bookkeeping transaction. There it was held that the Government, by furnishing Government air transportation to an Army physician, placed him in precisely the same position as if the Government had paid his fare on a private commercial air carrier, with the result that the Army doctor riding an Army transport plane was a fare-paying passenger within the meaning of the clause in his policy. The authorities cited by the defendant, in so far as they relate to the problem, furnish little assistance in the determination of whether, in the circumstances of this case, the insured was a fare-paying passenger. On the other hand, Janco v. John Hancock Mutual Life Ins. Co., 1947, 160 Pa.Super. 230, 232, 50 A.2d 695, suggests the possibility that the insured could have been a fare-paying passenger on an Army plane. See also the Quinones case, supra.

(2) The defendant contends that the use of the expression "commercial airline" ex-

cludes the possibility of any reference to Army or Government aircraft. But it is undeniable that the Government has engaged in commercial enterprises; and under an Army Regulation published July 24, 1942, titled "Army Air Forces, Passengers in Aircraft", certain Army air activities (not restricted to the Air Transport Command) might well be characterized as "commercial". The affidavit of General Gates indicates that there were indeed commercial air operations carried on by the Army and Navy. Note the reference to commercial air operations by the Army and Navy in Janco v. John Hancock Mutual Life Ins. Co., supra. See also, Executive Order Oct. 24, 1944, No. 9492. The mere fact that the insured's orders authorized "commercial and/or government aircraft" is not dispositive of the issue. Language used under such circumstances, even if effective in conveying a distinction, is not necessarily a criterion of the meaning of the language in a life insurance policy. While it is clear that the insured, at the time he met his death, was not a passenger on a private or civilian airline, it has not been made to appear that he was not a passenger on a "commercial airline".

(3) To sustain its burden of establishing that the insured was not flying on a "regularly scheduled route", the defendant has filed affidavits to the effect that the flight, during the course of which the insured was killed, was a "special" one. It is admitted by the plaintiffs that a purpose of the flight was to transport certain personnel from Eglington Field to Hendon. But, in addition, plaintiffs submitted an affidavit by Captain McMurtrie of the Royal Air Force, stating that on the date of the insured's death, there was a regularly scheduled route for planes flying between these two fields. Also, a counteraffidavit of General Giles, who caused an official inquiry to be made of the fatal accident, states that the investigating committee informed him that at the time of the accident the aircraft was engaged solely in transporting personnel on a regular route on which scheduled service was maintained.

The fact that the flight in question was a "special" one, not regularly scheduled, would not necessarily preclude a jury from concluding that it was, nevertheless, on a "regularly scheduled route". A factual contradiction on this point is apparent.

(4) It is admitted by the plaintiff that the airfield from which the ill-fated flight took off and the one at which it was to have landed were under military control at the time of the death of the insured. Defendant maintains that a "definitely established airport" is distinguishable from a military airport. However, a reasonable construction of the language would not compel such a distinction. Affiant McMurtrie classified the airports as "definitely established", and General Giles' affidavit is significant on this point. In Quinones v. Life & Casualty Ins. Co. of Tennessee, supra, military airports were held to fall within that classification. A similar meaning cannot be ruled out here.

As second basis for summary judgment, defendant urges the "Result of War" clause in the policy, asserting that the insured's death was clearly a result of war. Assuming, but not deciding, that this defense has not been waived, it nevertheless remains doubtful that the decedent died as a result of war within the meaning of the policy. As Judge Learned Hand pointed out in New England Mutual Life Ins. Co. v. Gillette, 2 Cir., 1948, 171 F.2d 500, the provision cannot be considered to cover all deaths which would not have happened had there been no war. The line must be drawn some place between immediate death by enemy action and death as a remote result of the war, in the sense that war was merely one of the conditions sine qua non to its happening. The insured did not die as an immediate result of enemy action, and it is certainly an issue of material fact whether the circumstances of his death fall on one side or the other of the line. Accordingly, therefore, an order will be entered denying defendant's motion for summary judgment.