WORLD INSURANCE COMPANY OF OMAHA, NEBRASKA, Appellant,

v.

Mrs. Zelma PIPES et al., Appellees.

No. 16915.

United States Court of Appeals Fifth Circuit.

May 6, 1958.

Rehearing Denied June 9, 1958.

Henry Bernstein, Jr., Monroe, La., Jack W. Marer, R. C. Andrews, Omaha, Neb., Hudson, Potts & Bernstein, Monroe, La., for appellant.

James Madison, Madison, Madison, Files & Shell, Bastrop, La., for complainants-appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Mrs. Zelma Pipes and her two children filed suit, as the widow and heirs of Henry A. Pipes, against World Insurance Company of Omaha, Nebraska. They seek recovery upon a health and accident policy on Mr. Pipes for sickness disability benefits at the rate of $200 a month, totaling $1,846.62, and for hospital and drug bills of $1,761.56, making an aggregate of $3,608.18. A jury trial was waived. The District Court for the Western District of Louisiana gave judgment for this amount, with a like amount as a penalty, and attorneys' fees of $1,500. Jurisdiction is based on diversity of citizenship.

I.

Henry A. Pipes, a resident of Oak Ridge, Louisiana, was born July 11, 1901 and died March 16, 1956. In May 1953 Pipes experienced a swelling in his legs below the knees, particularly at the ankles. Upon examination albumen was found in his urine. Dr. Lucian M. Ferris, physician for Pipes, concluded that Pipes was suffering from nephritis, a kidney disease. The stage was undetermined. The record does not show that Dr. Ferris ever told Pipes he had nephritis (Bright's disease), or that the seriousness of nephritis was ever explained to Pipes. Bed-rest and diet restrictions are important elements in the treatment of nephritis. Pipes was not restricted as to diet or activity. He was allowed to continue the active management of three plantations totaling about 1800 acres. In connection with duties that included supervision of a herd of cattle, he rode horseback extensively and drove a station wagon 20,000 miles a year.

Mr. Pipes' condition appeared to respond quickly to treatment. He saw Dr. Ferris on June 23, July 28, September 8, and November 2 for treatment, but by December 15, 1953 all apparent signs of the disease had disappeared. With exception of the July 28 visit, all urinalyses showed albumen. There is no showing that Pipes was informed of this fact (except on one occasion), nor is there any showing that he understood the importance of the urinalyses.

On several occasions prior to November 18, 1953, Thomas Files, defendant's local agent, also a resident of Oak Ridge, attempted to sell Pipes a "Farmers' and Ranchers'" disability benefit insurance policy. This policy does not require a medical examination. On November 18, 1953, Pipes signed an application blank filled out by the agent. The two key questions and answers are as follows:

"11. Are you sound physically and mentally to the best of your knowledge and information? Yes * * *

"12. Have you ever had any of the following diseases? * * * Kidney disease? Yes * * * Albumen, July 1953. No after effects."

Pipes never told his family or his close friends that he had nephritis or Bright's disease, indicating, said the trial judge, "we think, that he did not know he had the malady, if he did". He continued his usual business and social activities. On the strength of the defendant having accepted his application, he dropped similar insurance with another company. Pipes paid two annual premiums.

Some time in late December 1954 or early January 1955 Pipes suffered an attack of dysentery during the course of which he lost about 15 pounds. From this time on his health steadily declined. In late May or early June 1955 he went to Dr. W. B. Liles, a urologist, who diagnosed his illness as glomerulonephritis, chronic, active, and possibly in the subacute stage. From this time until March 16, 1956, the date of death, Pipes was hospitalized. While hospitalized he attempted to pay the third insurance premium, but appellant refused to accept it, declined liability, and attempted to return the sum of the first two premiums paid by Pipes. This, Pipes refused to accept.

Pipes' widow and heirs ask for all accrued benefits under the policy. World Insurance denies liability on the grounds that: (1) Pipes falsely induced it to write the policy; and (2) there was no coverage under the terms of the policy, because "the cause" of the "sickness" did not "originate" more than fifteen days after the date of the issuance of the policy.

## II.

Under Louisiana law, in order for an insurer to bar recovery on the ground of an insured's false statement, the insurer must show that the statement

(1) was made with intent to deceive or (2) that it materially affected the risk. LSA—R.S. 22:619.[1] Louisiana authorities agree that where a defendant asserts a special defense of this sort, the insurance company has the burden of proving wrongful intent or materiality, and that the answers of the insured are construed in his favor. Telford v. New York Life Ins. Co., 1955, 227 La. 855, 80 So.2d 711; Bankson v. Mutual Benefit Health & Accident Association, 1948, 208 La. 1008, 24 So.2d 59; 1 Appleman, Insurance Law and Practice, p. 253. The insurer must prove by a preponderance of the evidence, that the insured was not in sound health when the policy application was made. Mataya v. Delta Life Insurance Company, La.App.1954, 71 So.2d 139.

There is no question of fraud or intent to deceive in this case. Defendant's counsel conceded that Pipes was completely honest in making his application for insurance and the trial judge found that Pipes did not make any deliberately false or fraudulent statement of facts.

The insurer attacks three words in the application as false and materially increasing the risk. These are the words "No after effects", used after the insured admitted having kidney trouble and answered "Yes * * * Albumen, July, 1953". The trial judge found that the defendant had not shown that these three words were false; that Pipes' condition had improved to such an extent, by November, that for all he knew, his recovery was complete, or virtually so, and he had no reason to believe he had "after effects". The medical evidence was conflicting. Dr. Ferris testified that "it's a good assumption" Pipes died of the "same type of disease" he had in May,

1. LSA–R.S. 22:619 provides:
"A. Except as provided in Sub-section B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
"B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."

1953. But Dr. Liles, testified that in view of the remarkable and apparently complete recovery Pipes had made, it was entirely possible, and even likely, that he had sustained another infection, after November, 1953, which brought on a new attack of nephritis in early 1955 and it was this nephritis that culminated in his total disability from about June, 1955 until his death. Pipes' unrestricted freedom as to diet and activities supports the claimants' position.

■■ Materiality cannot be settled by a post-mortem pronouncement of the insurer who is sued for not paying the insured's claim.[2] It is for the court to say whether the matter allegedly misrepresented would affect a reasonable insurer's judgment as to acceptance of the risk. Here, the words "No after effects", written November 18, 1953, cannot be divorced from the rest of the answer admitting kidney trouble and stating "Albumen, July 1953".[3] It is a common knowledge, backed up by testimony in the record, that a reference to albumen in an insurance examination or application triggers a triple alert to insurance companies. This is the important material fact in the application. Pipes' honest answer to Question 12 was all the disclosure necessary for any reasonable underwriter to accept the risk or to investigate further.

■ The claimants make a strong case for estoppel.[4] (1) First, it was Files, the insurer's local agent, not Pipes, who wrote out the answers to the questions in the application.[5] World Insurance Company did not call on Files to

---

2. "The generally accepted test * * * [is] whether reasonably careful and intelligent underwriters would have regarded the fact or matter, communicated at the time of effecting the insurance, as substantially increasing the chances of loss insured against so as to bring about a rejection of the risk or the charging of an increased premium. * * * The matter is not one to be settled by the mere pronouncement of the company after the death has occurred, but the matter misrepresented must be of that character which the court can say would reasonably affect the insurer's judgment as to the nature of the risk and amount of premium. * * * " 29 Am.Jur., Insurance, Section 525.

3. As the trial judge stated, "it should have been perfectly clear to defendant's underwriter" that this was a mere expression of lay belief, opinion or judgment on the part of Mr. Pipes as to his condition. "Although false, a representation of the expectation, intention, belief, opinion, or judgment of the insured will not avoid the policy if there is no actual fraud in inducing the acceptance of the risk, or its acceptance at a lower rate of premium; and this is likewise the rule although the statement is material to the risk, if the statement is obviously of the foregoing character, since in such case the insurer is not justified in relying upon such a statement, but is obligated to make further inquiry. * * * Clearly, where matters of opinion or judgment are called for, answers made in good faith and without intent to deceive will not avoid the policy, although they are

untrue." 29 Am.Jur., "Insurance", Sec. 527.

4. "If the facts are such as to put the insurer on inquiry, the insurer, for the purpose of invoking an estoppel, is conclusively presumed to have knowledge if a reasonably prudent person would pursue such inquiry and obtain knowledge; or if the insured is legally justified in believing that the insurer has knowledge, and its acts or conduct, though merely thoughtless or inadvertent, induce a belief in him that the company will not assert its rights, upon which belief he relies and is detrimentally affected in some manner, an estoppel will arise. Such relinquishment need not be voluntary, intended, or desired by the insurance company." 16 Appleman on Insurance Law and Practice, § 9081, at page 594. See Hulbert v. National Life & Accident Insurance Company, Inc., La. App., 151 So. 87; Pilot Life Insurance Company v. Pulliam Motor Company, 4 Cir., 1956, 229 F.2d 912.

5. "The rule prevails in this state that an insurance agent in procuring an application for insurance and in reducing it to writing acts as the agent of the insurer. Under this rule, when an agent acting under the scope of his authority undertakes to fill out, and does fill out, an application for a policy of insurance, his acts, representations, and mistakes are those of the insurance company, in consequence of which, if the agent by reason of mistake, fraud, omission, or negligence inserts erroneous or untrue answers to the questions contained in the application, these representations bind

testify. If anyone was in a position to find out whether Pipes was still suffering from nephritis it was Files, the insurer's local agent. And in the little town of Oak Ridge, Louisiana, if Files did not know of his own knowledge to what extent Pipes had recovered, he could have learned with little effort. (2) Further, in reliance on the World Insurance Company having accepted him as a risk, Pipes dropped a similar policy already in force with another company.[6] (3) Finally, the answers Pipes gave in his application were sufficient to impel any reasonable underwriter to find out the facts. Instead, the World accepted the application and accepted the premiums. Under these circumstances, to us as to the trial judge, it seems unconscionable for the insurer to make the defense that Pipes falsely represented his condition of health in his application for insurance.

■ The insurer relies on Flint v. Prudential Insurance Co., La.App.1954, 70 So.2d 161; Karno v. Metropolitan Life Insurance Company, D.C.E.D.La.1956, 137 F.Supp. 893, affirmed 5 Cir., 1957, 242 F.2d 141; and Rhodes v. Metropolitan Life Insurance Company, 5 Cir., 1949, 172 F.2d 183. In each of these cases the insured made false statements in his application and there was strong evidence that the insured knew that the statement was false. On the other hand, the Court below found that the insured had no fraudulent intent, had made no false statements, and that the alleged misrepresentation was not material. We cannot say that the finding was clearly erroneous; on the contrary, we agree with the trial judge.

## III.

The insurer's second defense is that there was no coverage under the terms of the policy, because the cause of Pipes' sickness did not originate more than fifteen days after the issuance of the policy. The policy covers:

"(c) loss of time commencing while the policy is in force and resulting from sickness, the cause of which originates more than fifteen days after the policy date * * "

The complainants argue that "sickness" means a disabling illness, and that the "cause" of the disability ("loss of time") occurred after the critical date.

This is a close question. Does the language, "the cause of which originates more than fifteen days after the policy date", apply to the word "sickness", because it is in closest verbal proximity? Or does it apply to the whole preceding clause, and particularly to "loss of time"? Pipes could not recover for a sickness that did not cause loss of time. The policy was primarily a "disability" policy intended to insure against loss of time, rather than merely insuring against sickness as such. "Cause" has many meanings. It can be anything from some remote medical cause to the direct or immediate disabling cause that brings about the "sickness" and "loss of time". Does the word "originate", as used here, mean that the sickness originates when the first germ entered Pipes' body or when enough germs attacked his kidneys to disable Pipes? Must "sickness" be synonymous with "disease" in a medical sense? In its ordinary meaning, a person is not "sick" if he performs his

the insurer but are not binding upon the insured, provided he (the insured) is justifiably ignorant thereof, has no actual or implied knowledge thereof, and has been guilty of no bad faith or fraud. Hardy v. Commercial Standard Ins. Co., 172 La. 500, 134 So. 407; Beene v. Southern Casualty Co., 168 La. 307, 121 So. 876; Parker v. Citizens Fire Insurance Company of Missouri, 4 La.App. 711; Willhite v. Hartford Fire Ins. Co., 8 La.App. 538." Harris v. Guaranty Income Life Insurance Company, 1954, 226 La. 152, 75 So.2d 227, 229

6. "The insurer will be estopped from denying liability where, by its course of dealing, or its open actions, it has induced the insured to pursue a course of conduct to his detriment. The estoppel may arise in such instance where the insured has been dissuaded from obtaining other insurance in reliance upon the validity of the policies he holds. Incurring of expense by the insured may likewise constitute a basis of estoppel." 16 Appleman on Insurance Law and Practice, Sec. 9088, p. 623.

usual occupation and engages in his usual activities.

 Where there are ambiguities in a policy, Louisiana follows the usual rule of construing a policy liberally "to the end that equity be done and the underlying beneficent purposes of the contract be accomplished". McKinney v. American Security Life Insurance Company, La.App.1954, 76 So.2d 630, 633.[7] Giving the insured the benefit of the doubt, we agree with the trial judge that "sickness" under this policy means a disabling sickness causing loss of time from the insured's regular occupation and activities. This is in keeping with the purpose of the policy—to insure against disability.

The insurer relies on several Louisiana cases.[8] These strike all around the problem, but miss the mark. We find Dance v. Southern Surety Co., 1931, 16 La.App. 373, 134 So. 725 and Cryer v. Great American Casualty Co., 1928, 7 La.App. 469 persuasive. These two cases held that an insured may recover for disability resulting from a disease that first manifests itself after the critical date, although the medical cause existed before the date.[9] Pipes had apparently recovered at the time he applied for insurance. The subsequent appearance of

---

7. " * * * The intention of the parties is of paramount importance and must be determined in accordance with plain, ordinary and popular sense of the language used in the agreement and by giving consideration on a practical, reasonable and fair basis to the instrument in its entirety. Beard v. Peoples Industrial Life Insurance Company of Louisiana, La. App.1941, 5 So.2d 340. Provisions in a life, health and accident policy should be given a liberal interpretation to the end that equity be done and the underlying beneficent purposes of the contract not be rendered nugatory. Manhein v. New York Life Insurance Company, La.App.1941, 5 So.2d 918. In Louisiana jurisprudence doubts, uncertainties or ambiguities in insurance policies are to be resolved in favor of the insured and against the insurer. Green v. Bankers Indem. Ins. Co., D.C., 84 F.Supp. 504, affirmed 5 Cir., 181 F.2d 1; Heiman v. Pan-American Life Insurance Company, 1935, 183 La. 1045, 165 So. 195; Ardoin v. Great Southern Life Insurance Company, 1937, 186 La. 583, 173 So. 112; Muse v. Metropolitan Life Insurance Company, 1939, 193 La. 605, 192 So. 72, 125 A.L.R. 1075; Powell v. Liberty Industrial Life Insurance Company, Inc., 1941, 197 La. 894, 2 So.2d 638; Garrell v. Good Citizens Mutual Benefit Ass'n Inc., 1943, 204 La. 871, 16 So.2d 463; Quinones v. Life & Casualty Insurance Company of Tennessee, 1945, 209 La. 76, 24 So.2d 270; Stanley v. Cryer Drilling Company, 1948, 213 La. 980, 36 So.2d 9; Robbert v. Equitable Life Assurance Soc. of United States, 1949, 217 La. 325, 46 So.2d 286; Moll v. Mutual Health Benefit & Accident Ass'n, 1953, 223 La. 511, 66 So.2d 320; LSA-C.C. art. 1958." McKinney v. American Security Life Insurance Co., La.App., 76 So.2d 633.

8. Appellant cites Beard v. Jefferson Life & Cas. Co., La.App.1957, 95 So.2d 379; Vidrine v. Reserve Life Ins. Co., La. App.1952, 58 So.2d 251; Taormina v. National Hospital Service Ass'n, La. App.1949, 43 So.2d 31; Reed v. Continental Casualty Co., La.App.1937, 171 So. 491. In these cases, the insured either knew of his illness when he applied for the policy and made a deliberately false statement or it was affirmatively established that the disease which caused the disability had existed prior to the critical date and had only one continuing stage. The Vidrine case impliedly approved of the theory that if loss of time had been caused by a new infection or by a new stage of the disease, citing Dance, the insured could have recovered.

9. " * * * The parties had in mind, as the subject of indemnity, disability from illness or sickness or disease first manifesting itself or becoming active after the 30-day period. For this the policy promised indemnity. * * * A construction making the time of the medical cause of the outbreak of the disease determinative of liability, irrespective of actual illness, sickness or disease, as commonly understood, would make health insurance subject to uncertainty, unattractive to those wanting reasonable health insurance protection, and less marketable. The policy issued by the defendant is fair to the insurer and the insured. As we construe it the defendant is liable, though the medical cause of the disease existed prior to the policy, if the disease or sickness does not manifest itself until afterwards. So the ordinary man wanting health protection would understand it." Cohen v. North American Life & Casualty Co., 1921, 150 Minn. 507, 185 N.W. 939.

nephritis (even if a later stage of the first disease and not a new infection) is analogous to the manifestation of a disease after the critical date.[10]

The case of State Mutual Life Assur. Co. of Worcester, Mass. v. Heine, 6 Cir., 1944, 141 F.2d 741, 745, is similar to the case at bar. Loss of time resulted from locomotor ataxia. This disease has three stages: (1) pre-ataxic, (2) ataxic, (3) complete paralysis. At the time the policy was taken out the insured was suffering from the first stage, but the disease at that stage did not cause loss of time. The *immediate* cause of disability and loss of time was the second stage of the disease, which occurred after issuance of the policy. The Court said:

"The contract limited the liability of the insurer to such disability, or the cause thereof, as was sustained or contracted after the date of the policy. Viewing the contract as a whole, *the loss insured against was a disability* arising from an accident or disease. The ultimate facts show that the 'cause' (giving that word its ordinary meaning) of insured's disability occurred after the date of the policy. Locomotor ataxia is a successor of lunetic infection, the latter being the precursor of the former. * * * It is clear from the evidence that at the time the policy in question was issued, insured was suffering from the first stage of the disease, but that he had sustained no disablement therefrom. The second, or ataxic, stage was reached after the policy was issued with the resulting disablement. * * *

"The insurer did not insure appellant against a disease, but against disablement from a disease. The immediate cause of insured's disability was his affliction of locomotor ataxia in its second stage. It is

true that such stage would not have been reached but for the existence of the first stage of the disease, which latter stage could have continued throughout assured's lifetime without disablement."

The coverage provision of the policy issued to Mr. Pipes is similar to the coverage provision in the Heine case. Furthermore, nephritis has three stages: (1) acute, (2) sub-acute, (3) chronic.

In Milan v. Norwich Union Indemnity Co., 1929, 107 W.Va. 574, 149 S.E. 668, 669, an insured was suffering from nephritis at the time he took out a health and accident policy. The policy covered "sickness contracted during the term of the policy". He had been under medical treatment for nephritis for a year prior to taking out the policy, but the insured, a coal miner, had gone about his work without interruption. He was asked no questions about his health. The Court held that:

"* * * While the word 'sickness' is technically synonymous with such words as 'disease,' it is popularly differentiated in this way: One is not ordinarily considered sick who performs his usual occupation, though some organ of the body may be affected; he is regarded as sick, when that diseased condition has advanced far enough to incapacitate him. * * * A liberal construction of the term 'sickness contracted,' as used in this policy, requires that it be applied to the time when the malady was sufficiently active to disable the patient, and not to the time when it originated. * * *"

The Heine and Milam cases are no stronger than the instant case. The trial judge found from a review of the medical testimony that no one could tell with reasonable certainty from what stage of nephritis Pipes suffered in 1953,

10. In a note on Taormina v. National Hospital Service Ass'n, La.App.1949, 43 So.2d 31, reviewing the Louisiana cases, the author concludes: "* * * However, it is submitted that the result reached by other jurisdictions and indicated by a majority of the Louisiana cases is the more desirable one in that an insured, when such a policy is issued to him, should properly expect to be protected against loss from future illness [disability], whether or not the medical cause thereof exists prior to the critical date. * * *" 24 Tul.L.R. 490 (1950).

or whether by November 18, 1953 he had made a complete recovery and that death was caused by a new infection. His sickness—in terms of inability to carry on his daily work and activities—did not begin until May or June 1955. The trial judge found, whether the policy is construed strictly or liberally, that the insurer had not met the burden of proving that the cause of the "sickness" antedated the critical date. On the record, we cannot say that this holding is clearly erroneous.

## IV.

 Under Louisiana law an insurance company may be assessed a penalty of double the amount of the health and accident benefits plus attorney's fees, if it fails to pay a claim without a just and reasonable ground, LSA–R.S. 22:-657.[11] "It is generally agreed", however, "that if there is substantial ground for refusal, reasonable defenses, or what one Louisiana Court has termed a 'serious defense', as distinguished from frivolous defenses, the penalties have no application". 3 Appleman, Insurance Law and Practice Sec. 1611. See Womack v. Life & Casualty Ins. Co., La.App.1938, 184 So. 357; McKinney v. American Security Life Ins. Co., La.App.1954, 76 So.2d 630; Cryer v. Great American Casualty Co., 1928, 7 La.App. 469; Crowe v. Equitable Life Assur. Soc. of U. S., 179 La. 444, 154 So. 52. "Penalties in civil actions are not favored by the courts, and should not be imposed except in cases that are clear and free from doubt." Massachusetts Protective Ass'n, Inc., v. Ferguson, 1929, 168 La. 271, 121 So. 863, 866.

 We affirm the judgment of the trial court in favor of the complainants' main demand. But we cannot say that the insurer's defenses were frivolous or arbitrary. The defendant put the trial court, and this court, to a careful study of the record and the jurisprudence before either court could reach a reasoned conclusion. We disagree with the insurer, but we hold that the insurer should not be penalized for asserting what seem to us serious and substantial, although unsuccessful, defenses. The judgment below is

Affirmed in part and reversed in part.

## On Petition for Rehearing.

### PER CURIAM.

 Appellant argues that owing to the fact that no one has ever been able to determine what stage of nephritis the deceased had when he took out the policy and when he died, that appellee failed to sustain her burden of showing that the cause of the sickness did not occur within the prohibited fifteen day time limit. Appellant places much emphasis on Meth v. United Benefit Life Insurance Company, 3 Cir., 1952, 198 F. 2d 446, 447. This case held that: "Though we have referred to 'prior origin' as a defense of the insurance company, actually it was incumbent upon the plaintiff to show that Meth's disability was within the coverage of the policies." The court was construing the state law of Pennsylvania. The law of Louisiana is just the opposite, and such clauses have been construed as being special defenses because they exclude coverage, and the insurance company has the burden of proof. Telford v. New York Life Insurance Company, 1955, 227 La. 855, 80 So.2d 711; Mataya v. Delta Life Insurance Company, La.App.1954, 71 So.2d .139; Catchot v. Delta Life Insurance Company, La.App.1952, 57 So.2d 919, 921, 922. The general rule is that the insurer must prove that the insured was not in sound health when the policy was

11. LSA–R.S. 22:657 provides: "All claims arising under the terms of health and accident contracts issued in this state shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent business man on his guard, exist. * * * Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court."

issued. The court in the Catchot case said:

"* * * [W]e now hold that where a policy, in large type and as a part of the coverage, provides that a specific amount will be paid for a specific loss, and then, in much smaller type and in another paragraph headed 'Provisions', stipulates that the payment will be made only if the disease which causes the loss comes into being after the issuance of the policy, *the burden is on the defendant to show that the disease was in existence before the policy was issued and that that same disease caused the loss.*"

It is ordered that the petition for rehearing filed in the above styled and numbered cause be, and the same is hereby

Denied.