Mrs. Zelma PIPES, Henry A. Pipes, Jr., and Caleb Windsor Pipes

v.

WORLD INSURANCE COMPANY OF OMAHA, NEBRASKA.

No. 5580.

United States District Court
W. D. Louisiana, Monroe Division.

March 28, 1957.

**372**

James Madison, Madison, Madison, Files & Shell, Bastrop, La., for plaintiffs.

Henry Bernstein, Jr., Hudson, Potts & Bernstein, Monroe, La., for defendant.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

■ This diversity action[1] seeks recovery upon a Health and Accident insurance policy issued by defendant. The claims are for sickness disability benefits at the rate of $200 per month, totaling $1,846.62, and hospital and drug expenses of $1,761.56, aggregating $3,608.18. A like amount, plus a reasonable attorney's fee, as the statutory penalty for non-payment, under LSA–R.S. 22:657, also is claimed.

Plaintiffs originally demanded a jury trial, but this was waived and the case was tried to the Court. After thorough study of the record, the briefs, and the applicable authorities, we have arrived at the following Findings of Fact[2] and Conclusions of Law:

Plaintiffs are the widow and heirs-at-law of Henry A. Pipes, a resident of Oak Ridge, Louisiana, who was born on July 11, 1901, and who died on March 16, 1956. Some time prior to November 18, 1953, on which date the policy sued upon was sold to him, he had obtained another policy of Health and Accident insurance from Mutual Benefit Health & Accident Association. In January, 1953, he was operated upon at the Campbell Clinic in Memphis, Tennessee, for a ruptured intervertebral disc, having been disabled for some weeks following the operation, but apparently making a complete recovery from that condition after about two months. He made claim for, and received, benefits under his policy with Mutual Benefit as the result of that disability.

In early May of 1953, Mr. Pipes experienced a condition of swelling in his legs below the knees, particularly at the ankles. On May 20, he went to Vicksburg, Mississippi, where he consulted Dr. Lucian M. Ferris about this trouble. Upon laboratory examination albumen was found in his urine. Dr. Ferris concluded that he was suffering from nephritis, or kidney disease, stage undetermined. He immediately started Mr. Pipes on a course of medicines designed to alleviate or cure his condition. There is no evidence to show that he ever actually told Mr. Pipes that he had nephritis, or Bright's disease, or that, if he had done so, the latter would have understood its significance. Likewise, there is no showing that he explained

---

1. Plaintiffs are citizens of Louisiana; defendant a corporate citizen of Nebraska. The claim is for more than $3,000. Hence jurisdiction exists. 28 U.S.C.A. § 1332.

2. Many of the pertinent facts have been stipulated by counsel, including an agreement that, if there is liability, the figures included in the basic claim are correct; also, if the penalty is awarded, that an attorney's fee of $1,500 would be fair and reasonable.

the seriousness of his findings. He did not place his patient under any restrictions as to diet or activity, and Mr. Pipes continued to perform, with little or no apparent difficulty, all of his regular duties in the active management of three sizeable plantations, totaling about 1,800 acres, including, among other activities, extensive driving and horseback riding in the supervision of about 125 head of cattle. In its outward manifestations, Mr. Pipes' condition quickly responded to the medicines, and in a short time the swelling had subsided to the point where it was hardly noticeable. He saw Dr. Ferris again on June 23, July 28, September 8, and November 2, 1953. By the date of this last examination Mr. Pipes' condition had improved remarkably and, except for occasional muscle cramps in his legs, not shown by this record to be connected with nephritis, he was feeling very good. The next examination was on December 15, 1953, when all apparent signs and symptoms had disappeared. However, urinalyses on each of these dates, except July 28, 1953, were positive for albumen. In that respect, the record does not disclose that Dr. Ferris advised Mr. Pipes about this on more than one occasion, nor is there any showing that the patient understood in the slightest the importance of this finding.

On several occasions prior to November 18, 1953, defendant's local agent, Mr. Thomas O. Files, a fellow-townsman of Mr. Pipes, had attempted to sell him a so-called "Farmers and Ranchers" disability benefit insurance policy. On that date, Mr. Pipes agreed with Mr. Files to subscribe to defendant's policy, and signed an application blank which was filled out by the agent. The pertinent questions in the application, respecting his condition of health, read as follows:

"6. In what Companies, Associations, or Societies, including this Company, do you now carry accident or health insurance? Mutual Benefit. ...... Indemnities? 200.00 Mo.

"7. Have you any application for life, accident or health insurance pending? No. ...... If so, kind and name of company.

"8. Has any application for life, accident or health insurance ever been declined, postponed or modified? No. ...... By whom? ..... Why?...... When?....

"9. Has any life, accident or health insurance issued to you ever been cancelled or renewal refused? No. ...... By whom? ...... Why? ..... When? .......

"10. Have you ever made claim for injury or sickness? Yes. ...... From whom? Mutual Benefit. ...... Dates? Jan. 1953. ...... For what? Removal disk.

"11. Are you sound physically and mentally *to the best of your knowledge and information? Yes.* Are you maimed or deformed? No. Have you any impairment of sight or hearing? No. Do you have hernia or rupture? No. Are your habits correct and temperate? Yes. (Emphasis supplied.)

"12. *Have you ever had any of the following diseases:* Rheumatism in any form? No. Tuberculosis? No. Epilepsy? No. Heart Disease? No. High or low blood pressure? No. Disease of the brain or nervous system? No. Diabetes? No. *Kidney disease? Yes.* Stomach or gall bladder trouble? No. If so give details. *Albumen, July 1953. No after effects.* (Emphasis supplied.)

"13. Have you received medical or surgical advice or treatment or had any local or constitutional disease within the past five years? Yes. ...... When? 1953. ...... For what? Removal disk in Back. ...... Duration. 45 days. When? No after effects. ...... For What? ...... Duration. ......

"14. Have you ever had a surgical operation? Yes. When? 1953. For what? Removal disk."

As will be shown, it is with regard to the answers given by Mr. Pipes to the questions contained in Paragraphs 11 and 12 of the application that one of the principal disputes in this case is centered. Of substantial importance, in comparing the facts here involved with those in other reported cases of a similar nature, is the fact that the application did not contain any of the questions usually found in such applications as to the names and addresses of doctors who had examined or treated the applicant within the past few years. Neither did it require a medical examination before the policy was to be issued. Moreover, unlike many such insurance policies, this one made no provision for it to become effective only upon the insured's being in good health when it was applied for and delivered.

The annual premium, which was paid by Mr. Pipes in advance, was $236. In due course, the policy was issued. It provided for monthly benefits in the sum of $200 for total disability, caused by accident or sickness, plus hospital room and board, not to exceed $10 per day, for the period of hospital confinement, but not exceeding 90 days for any one injury or sickness. It also provided for reimbursement of miscellaneous hospital expenses, including laboratory, drugs, medication, etc.

On or before November 18, 1954, Mr. Pipes paid another annual premium. He also attempted to pay still another in the same amount, on or before November 18, 1955, but defendant declined to accept this, and on November 4, 1955, it attempted to return the premiums previously received by it to Mr. Pipes, but this tender was refused.

Meantime, during the remainder of 1953, and most of 1954, Mr. Pipes had continued to lead an apparently normal life, attending to all of his regular duties. He had no more trouble from swelling in his legs or ankles, carried on normal family and social activities, and appeared in good spirits. He never told his family or his close friends that he had nephritis, or Bright's disease, indicating, we think, that he did not know he had the malady, if he did. To all intents and purposes he apparently considered, especially at the time when he applied for this insurance, that he had made a practically complete recovery from his earlier ailments. It is certain, we think, that he did not realize at that time, if such indeed was true, that his life, or even his normal activities, were in any jeopardy. During this period he also visited Dr. Ferris, at several months' intervals, and continued to take the medicines the doctor prescribed for him. On the strength of his having been accepted as insurable by defendant, through its issuance of the policy sued upon, he dropped his policy with Mutual Benefit, defendant having been advised that this would be done in connection with his application for this policy.

In late December of 1954, or early January of 1955, Mr. Pipes suffered an attack of dysentery, lasting several weeks, during the course of which he lost about 15 pounds in weight. Thereafter, he could not regain his former weight, and from this point onward his condition seemed to go steadily downhill. In late May or early June of 1955, his wife insisted that he go to Dr. W. B. Liles, a specialist in urology at Monroe, Louisiana. This doctor diagnosed his condition as glomerulonephritis, chronic, active, and possibly in the sub-acute stage. He was then a very sick man—dangerously so. Dr. Hayden Cutler (since deceased) was called into consultation and the doctors decided to hospitalize Mr. Pipes. Thenceforth he was confined to the hospital a good part of the time, and was totally disabled, until his death on March 16, 1956.

On July 28 and August 6, 1955, claims were made to defendant, by or for Mr. Pipes, for disability and hospital expenses under the policy, on forms prescribed by the company. As stated, on November 9, 1955, he sent defendant his check for $236 to pay the third annual premium. This payment was not accepted, however, and was returned to

him on November 15, 1955. Meanwhile, on November 4, 1955, defendant declined liability and attempted to return the two premiums previously paid, totaling $472, but Mr. Pipes refused to accept this sum, or to surrender in any way his rights under the policy. Subsequent to his death demand was made upon defendant for all accrued benefits. Liability again was denied, defendant contending, then and in its answer to this suit, 1) that Mr. Pipes had falsely induced it to write the policy, and 2) that, in any event, there was no coverage provided by the policy for the reason that "the cause" of his sickness did not "originate" more than 15 days after the policy date, which defendant asserts was required by its terms. We now discuss these defenses, in the order of their statement.

In support of its first point, that Mr. Pipes falsely induced it to write the policy, and, therefore, that it is not liable, defendant relies principally upon Flint v. Prudential Insurance Co., La. App., 70 So.2d 161; Karno v. Metropolitan Life Insurance Co., D.C.E.D.La., 137 F.Supp. 893, affirmed 5 Cir., 242 F.2d 141; and Rhodes v. Metropolitan Life Insurance Co., 5 Cir., 172 F.2d 183. After careful analysis of those decisions, it is our considered opinion that they are not controlling, or even persuasive here, because the facts there involved were substantially dissimilar to those here presented.

In Flint, the insurer had issued a $10,000 life insurance policy on May 2, 1949, on an application made on April 5, 1949. The insured died on January 13, 1950, some seven months later. The defense was that the insured, by his answers to questions in the application, had made false statements in denying that he had " * * * consulted or been attended by any physician * * * for any reason during the past three years * * *", and in further stating, not only that he had not suffered from any of a long list of specific ailments, but that he had not had "Any other illnesses or indications of any physical * * * disorder * * * or infirmity * * *". The undisputed facts showed that in the several years immediately prior to applying for the policy he had consulted a large number of physicians, who had diagnosed his condition as arteriosclerosis. He also had made several trips to the Mayo Clinic, in Rochester, Minnesota, for diagnosis and treatment. He had been informed in detail as to his condition, had been placed upon a special diet, and was instructed to discontinue smoking. His conscience bothered him about his actions to the extent that he discussed his non-disclosures, and false answers, with his personal physician. His death was due primarily to cancer, but some of the physicians thought that arteriosclerosis was a contributing cause. In holding that the insurer was not liable under such circumstances, the Court applied the provisions of LSA–R.S. 22:619,[3] finding that the false statements of the insured, even if not made with actual intent to deceive (the evidence strongly indicating the contrary), materially affected the acceptance of the risk and the hazard assumed by the insurer. As will be shown in some detail infra, Mr. Pipes

3. LSA–R.S. 22:619:
 "A. Except as provided in Sub-section B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
 "B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."

did not make any false statements of fact to defendant in his application, but on the contrary answered the pertinent questions truthfully and according to his own honest, justifiable conception of his physical condition. Moreover, as also will be shown, it is our opinion that any misstatements made by him did not in law materially affect either the acceptance of the risk or the hazard assumed by the insurer.

In Karno, the defendant had issued a $5,000 life insurance policy on the life of David Karno on November 1, 1950. He died of heart disease slightly more than five months later, on April 12, 1951. In his application for the policy, Karno stated that he had never had an ailment or disease of the heart, that he had not consulted or been treated by a physician within five years preceding the date of the application, other than for a negative routine physical examination, that no treatments had been prescribed for him, and that his first and only visit to a doctor during that period was for this examination. Actually, he had been a regular patient of a Dr. Manuel Gardberg; numerous examinations, including six electro-cardiograms, made during this period, showed that he was suffering from angina pectoris; the doctor had prescribed his taking nitroglycerine for attacks of pain, and he had been advised to avoid physical, mental and emotional fatigue. The preponderance of the evidence showed that Karno had been advised as to his condition, and he is bound to have known of it from the pain and disability he suffered. Judge Wright found that Karno had made deliberately false statements in his application which materially affected the acceptance of the risk and the hazard assumed by the insurer. Hence, there was judgment for the insurer. Again we note, in contrast to the facts in Karno, that Mr. Pipes did not make any false statements of fact to defendant. He told it he had suffered from kidney disease, and that albumen had been found in his urine, notwithstanding which information defendant still chose to issue the policy without further investigation, and without requiring a physical examination.

In Rhodes, the Court found that the insured had applied for $20,000 in life insurance on June 19, 1947, and died, after the policy had been issued, less than three months later, on September 11, 1947. In affirming a judgment upon a directed verdict for defendant, granted by the trial Court, the Court of Appeals pointed to the insured's answers, in the policy application, wherein he represented that he had not had any disease of the kidneys, that he had never been told that he had sugar in his urine, that he had never had diabetes, and that he had not consulted with or been treated by any physician within the previous five years. His own personal physician testified at the trial, over plaintiff's objection, that he had told the insured he had sugar in his urine and diabetes; and that he had treated him over a period of weeks within a very short time before application for the insurance was made. This, concluded the Court, left " * * * no room for doubt that he not only made false answers but that he knew the answers to be false." Assuming, arguendo, that there had been no fraud, still the Court found that these representations were material to the risk and avoided the policy. We think the essential differences of fact between Rhodes and this case are self-evident; but again note that there is no evidence of deliberate falsity in Mr. Pipes' factual answers, nor did he make any material misrepresentations of fact which properly could be said to require avoidance of the policy.

Schriedel v. John Hancock Life Insurance Co., Mo.App., 133 S.W.2d 1103, also relied on by defendant, clearly is not apposite. There the policy sued upon contained a "sound health" provision that it should not take effect unless, upon its date of issuance, the insured actually was in sound health. The present policy contains no such requirement. Moreover, that case involved the application of a Missouri statute

which has no counterpart in Louisiana law.

The Louisiana authorities are unanimous in holding that, where a defense such as this is made, attributing false or fraudulent statements to the insured in an effort to avoid liability on the policy, the burden of proving the truth of such charges, by a clear preponderance of the evidence, falls upon the insurer. Telford v. New York Life Insurance Co., 1955, 227 La. 855, 80 So. 2d 711, and authorities therein cited. In addition to this requirement, the insurer is required to prove, with the same degree of certainty, that the insured was not in sound health when the policy application was made. Mataya v. Delta Life Insurance Co., La.App. 1954, 71 So.2d 139. Being special defenses, the law fairly and properly places the burden of proof upon the insurer. Bankson v. Mutual Benefit Health & Accident Association, 1945, 208 La. 1008, 24 So.2d 59.

As shown, we do not believe this record discloses that Mr. Pipes made any deliberately false or fraudulent statements of fact in the policy application. Defendant's counsel, indeed, has conceded his complete honesty. In his answers to the questions he truthfully admitted that he had suffered from kidney disease, and in supplying the details called for, stated: "Albumen, July 1953. No after effects." The answers to the questions were written on the application blank by Mr. Files, defendant's agent, who was not called as a witness by defendant to prove or disprove that the exact words used were those of Mr. Pipes, or merely his own conclusions, especially as to the term "No after effects." The Louisiana jurisprudence makes it clear that an insurance agent, in procuring an application for insurance and in reducing it to writing, acts as the agent of the insurer, which is held accountable for any mistakes, omissions or untrue answers, which are binding upon the insurer, but not the insured, if the latter is justifiably ignorant thereof, has no actual or implied knowledge thereof, and has been guilty of no bad faith or fraud.[4] By its failure to call Mr. Files to testify, defendant has left these questions unanswered.

In evidence is the deposition of R. A. Kuran, Secretary and Chief Underwriter of the Accident and Health Department of World Insurance Company. He testified, in effect, that the policy was issued in complete reliance upon the answers to the questions in the applications, and that it would not have been issued if the company had known Mr. Pipes was suffering from nephritis, or Bright's disease. In other words, he concluded that these answers were false in their entirety and *materially* affected the acceptance of the risk and the hazard assumed by defendant.

His self-serving conclusion, however, is not the true test of the *materiality* of such statements, either generally, or within the terms of LSA–R.S. 22:619, subd. B. The proper test for

---

4. Harris v. Guaranty Income Life Insurance Co., 1954, 226 La. 152, 75 So.2d 227, 229:
"The rule prevails in this state that an insurance agent in procuring an application for insurance and in reducing it to writing acts as the agent of the insurer. Under this rule, when an agent acting under the scope of his authority undertakes to fill out, and does fill out, an application for a policy of insurance, *his acts, representations, and mistakes are those of the insurance company*, in consequence of which, if the agent by reason of mistake, fraud, omission, or negligence inserts erroneous or untrue answers to the questions contained in the application, these representations bind the insurer but are not binding upon the insured, *provided he (the insured) is justifiably ignorant thereof, has no actual or implied knowledge thereof, and has been guilty of no bad faith or fraud.* Hardy v. Commercial Standard Ins. Co., 172 La. 500, 134 So. 407; Beene v. Southern Casualty Co., 168 La. 307, 121 So. 876; Parker v. Citizens Fire Insurance Co. of Missouri, 4 La. App. 711; Willhite v. Hartford Fire Ins. Co., 8 La.App. 538." (Emphasis first above supplied.)

determining materiality is whether reasonably careful and intelligent underwriters would have regarded the answers as substantially increasing the chances of a loss upon the risk insured against, so as to cause rejection of the application, or the charging of an increased premium. Decision on this question may not be left to the self-interested determination of the insurer after loss has occurred, i. e., the matter is not one to be settled by the mere pronouncement of the insurer. The misrepresentation, if any, must be of such character that the Court itself can say it reasonably would have misled the underwriter's judgment as to the nature of the risk or amount of premium.[5]

■ Here the only statement in the application which is attacked by defendant, and which, by stretching matters unjustifiably in its favor, might be deemed untrue or misleading, is the term "No after effects" which was used after reporting the history of kidney disease and the finding of albumen. In our judgment, it should have been perfectly clear to defendant's underwriter that this was a mere expression of lay belief, opinion or judgment on the part of Mr. Pipes as to his condition. Even though false (defendant has not shown satisfactorily that this was so), such a representation will not void the policy if there was no actual fraud in inducing the acceptance of the risk. As stated, defendant has made no effort to prove that Mr. Pipes was guilty of any such fraud, and, on the contrary, has conceded his complete honesty. The same rule is applicable, even if the statement is material to the risk, where it obviously is nothing more than a belief or opinion.[6]

As we have shown already, when Mr. Pipes signed the application his condition had improved to such an extent that, not understanding its potentialities, he undoubtedly was of the sincere belief, and expressed his opinion, that he had experienced "No after effects". For all he knew at that time, his recovery was complete, or virtually so, and he had no reason to believe he had, or would have, "after effects".

5. 29 Am.Jur., "Insurance", § 525:
 "*Determination of Materiality.*—The generally accepted test for determining the materiality of a fact or matter as to which a representation is made to the insurer by an applicant for insurance is to be found in the answer to the question whether reasonably careful and intelligent underwriters would have regarded the fact or matter, communicated at the time of effecting the insurance, as substantially increasing the chances of loss insured against so as to bring about a rejection of the risk or the charging of an increased premium. The fact that if the matters misrepresented had been truly disclosed they would have caused delay in issuing the policy while further inquiries were being made is not sufficient to make such matters material. Whether a life insurance policy would have been issued had true answers been given in the application cannot be left to the determination of the insurer after the death of the insured. The matter is not one to be settled by the mere pronouncement of the company after the death has occurred, but the matter misrepresented must be of that character which the court can say would reasonably affect the insurer's judgment as to the nature of the risk and amount of premium. * * *"

6. Ibid. § 527:
 "*Expressions of Opinion or Expectation.*—Although false, a representation of the expectation, intention, *belief, opinion, or judgment of the insured will not avoid the policy if there is no actual fraud in inducing the acceptance of the risk,* or its acceptance at a lower rate of premium; *and this is likewise the rule although the statement is material to the risk, if the statement is obviously of the foregoing character, since in such case the insurer is not justified in relying upon such a statement, but is obligated to make further inquiry.* * * * Clearly, where matters of opinion or judgment are called for, answers made in good faith and without intent to deceive will not avoid the policy, although they are untrue." (Emphasis supplied.)
 Cited with approval in Mutual Life Insurance Co. of New York v. Schafer, D. C.W.D.Wash.1943, 50 F.Supp. 921.

While Dr. Ferris expressed the opinion in his deposition, in answer to a hypothetical question, that Mr. Pipes' disability and subsequent death probably resulted from the same condition of nephritis he found upon his first examination, in May, 1953, yet we learn from the testimony of Dr. Liles that medically there can be no such probability. He stated that nephritis is caused by a streptococcus infection; and it is his opinion, in view of the remarkable and apparently complete recovery made by Mr. Pipes during the latter part of 1953, that it was entirely possible, and even likely, that he sustained another new infection which brought about a new attack of nephritis which began in early 1955, and which culminated in his total disability from about June, 1955, until his death.

■ There are still other important considerations which we think legally and equitably should affect the outcome of this case. As already noted, in the authorities cited in Footnote 6, where answers are given in an application which reasonably should have been sufficient in their import to put the insurer on inquiry, it may not ignore such answers, but must make further investigation, or be estopped to raise matters, by way of defense, which would have been disclosed by further checking.[7]

■ Here the undisputed testimony of both doctors familiar with the case, and of a disinterested officer of another insurance company, is unanimous that the disclosure by Mr. Pipes of a history of kidney disease, with the presence of albumen, should have been sufficient to put any reasonable underwriter on notice that further investigation should be made. These witnesses stated that the presence of albumen alone should have been like a "red light"—a clear warning—to defendant and should have caused it to make further inquiry to determine all of the facts regarding this man's condition. Having failed to do so and having accepted the premiums paid by Mr. Pipes, before and after issuance of the policy, we think defendant should be estopped from contesting its validity and effectiveness at this late date.

■ Moreover, we find still another strong reason for holding that defendant is estopped to raise the defense it is asserting here, in that, relying upon its having accepted him as a risk, Mr. Pipes dropped the policy he already had in force with Mutual Benefit. Having thus been induced by defendant's conduct to rely upon the validity of the policy he bought from it, we think it would be unconscionable for us to permit defendant to escape liability on the grounds it now urges.[8]

---

7. 16 Appleman on Insurance Law and Practice, § 9081, at page 594:
"'Estoppel' * * * refers to an abatement raised by law of rights and privileges of the insurer where it would be inequitable to permit their assertion. It necessarily implies prejudicial reliance of the insured upon some act, conduct, or nonaction of the insurer. Such action or nonaction need not be with knowledge on the part of the insurer of the circumstances giving it the particular rights and privileges in question. *If the facts are such as to put the insurer on inquiry, the insurer,* for the purpose of invoking an estoppel, *is conclusively presumed to have knowledge if a reasonably prudent person would pursue such inquiry and obtain knowledge;* or if the insured is legally justified in believing that the insurer has knowledge, and its acts or conduct, though merely thoughtless or inadvertent, *induce a belief in him that the company will not assert its rights, upon which belief he relies and is detrimentally affected in some manner, an estoppel will arise.* Such relinquishment need not be voluntary, intended, or desired by the insurance company." (Emphasis supplied.)
See also, to the same effect, Hulbert v. National Life & Accident Insurance Co., Inc., La.App., 151 So. 87; Pilot Life Insurance Co. v. Pulliam Motor Co., 4 Cir., 1956, 229 F.2d 912; and Industrial Life & Health Insurance Co. v. Trinkle, Tenn.App.1947, 204 S.W.2d 827.

8. Ibid. § 9088, at page 623:
"Since forfeitures are not favored in the law, an insurance company may not set up a forfeiture where by its course

It is clear, we think, that defendant has failed in all respects to sustain the burden of proof which the law requires it to bear in matters of this kind. For these reasons, therefore, we can reach no other conclusion than that the first defense is without merit.

The second point of defense, that there was no coverage under the terms of the policy, in our judgment is no better taken than the first.

The clause relied on by defendant insured Mr. Pipes against:

"(c) loss of time commencing while the policy is in force and *resulting from sickness, the cause of which originates more than 15 days after the Policy Date* and while this policy is in force, hereinafter called such sickness".

It is readily apparent, from reading this clause, that there are at least three words in it, the exact meanings of which are not defined in the policy, and which are ambiguous—susceptible of more than one meaning. We refer to "sickness", "cause" and "originates".

■■ It is far from clear as to what degree of sickness is meant by use of that term, it being common knowledge that this conceivably can range from slight physical indisposition to a condition *in extremis*. Probably the fairest construction of the term, in the context where it is found, would be that degree of sickness which causes "loss of time" from the insured's regular occupation.

The word "cause", according to any standard dictionary, has dozens of meanings, and shades of meaning. As here used, we cannot tell whether it means "remote cause", no matter how remote it may be, or whether it means the immediate, "direct cause" which proximately brought about the "sickness" and "loss of time".

"Originates" usually means "begins, starts, commences", etc., but again we find it far from easy either practically or medically to determine from this policy exactly what is meant by that word as here used. For example, did Mr. Pipes' "sickness" "originate" when the first streptococcus germ entered his body, at some unknown time, or did it "originate" only when enough germs had attacked his kidneys to produce an actually disabling condition?

■■■■ Louisiana Courts, in keeping with the teachings of our Civil Code [9] (and the rule prevailing in all other jurisdictions, so far as we know), unfailingly have held that, in cases of ambiguity in an insurance contract, any doubts as to the meaning of ambiguous words should be resolved against the insurer and in favor of the insured. Provisions in a policy such as this should be given a broad, liberal interpretation so that the dominant beneficent pur-

---

of conduct it has induced a belief in the insured that a provision for forfeiture will not be insisted upon, or where it leads a party honestly to believe that by conforming thereto a forfeiture will not be incurred, as in such instances the courts will interpose an estoppel to safeguard the rights of the policyholder. The insurer will be estopped from denying liability where, by its course of dealing, or its open actions, it has induced the insured to pursue a course of conduct to his detriment. *The estoppel may arise in such instance where the insured has been dissuaded from obtaining other insurance in reliance upon the validity of the policies he holds.* Incurring of expense by the insured may likewise constitute a basis of estoppel.

"*Where an insurer, or its agent, has knowledge, actual or imputed, of facts under which the express terms of the policy render it void, or unenforceable from its inception, and then issues the policy, the issuance is equivalent to an assertion by the insurer that such facts do not invalidate the policy, and if the insured has acted in good faith, the insurer is thereby estopped after loss from claiming that such facts avoid its liability thereunder.* * * *"* (Emphasis supplied.)

9. LSA–Civil Code, Articles 1957, 1958.

poses of the contract will not be avoided where the doubts as to coverage, if such exist, were created by the insurer in drafting the terms of the policy.[10]

 Applying those principles to the facts here found, we are forced to the conclusion that this policy did cover the benefits claimed. As already shown, this was a "disability" policy, intended to insure against "loss of time" rather than disease or sickness itself. This is plainly demonstrated by other parts of the policy. On its cover it is designated as "The Preferred *Disability Benefit* Policy for Farmers and Ranchers". Under the heading "Sickness Benefits" the following language, referring repeatedly to "disability" and "loss of time", is found:

"Part Seven Confining *Total Disability* Benefits for Life

"If sickness causes continuous *total disability and total loss of time*, and requires continuous confinement within doors and the regular and personal attendance therein of a licensed physician, surgeon, osteopath or chiropractor, other than the Insured, the Company will pay benefits for one day or more, at the rate of the Monthly Benefit stated in the Policy Schedule, beginning with the first medical treatment *during disability*, so long as the Insured lives and is *so disabled* and confined.

"Part Eight Non-Confining *Total Disability* Benefits for Twelve Months

"If such sickness does not require continuous confinement within doors but does cause continuous *total disability and total loss of time* and requires the regular and personal attendance of a licensed physician, surgeon, osteopath or chiropractor, other than the Insured, the Company will pay benefits, at the rate of the Monthly Benefit stated in the Policy Schedule, beginning with the first medical treatment *during disability*, for the period the Insured is *so disabled* but not exceeding twelve months for any one sickness." (Emphasis supplied.)

Other language at other parts of the policy, unnecessary to detail here, also confirms our conclusion that the insurance was intended to cover "disability *and* loss of time", not the maladies themselves which produced it.

---

10. McKinney v. American Security Life Insurance Co., La.App., 76 So.2d 630, 633:
"* * * The intention of the parties is of paramount importance and must be determined in accordance with plain, ordinary and popular sense of the language used in the agreement and by giving consideration on a practical, reasonable and fair basis to the instrument in its entirety. Beard v. Peoples Industrial Life Insurance Co. of Louisiana, La.App.1941, 5 So.2d 340. Provisions in a life, health and accident policy should be given a liberal interpretation to the end that equity be done and the underlying beneficent purposes of the contract not be rendered nugatory. Manhein v. New York Life Insurance Co., La.App.1941, 5 So.2d 918. In Louisiana jurisprudence doubts, uncertainties or ambiguities in insurance policies are to be resolved in favor of the insured and against the insurer. Green v. Bankers Indem. Ins. Co., D.C., 84 F.Supp. 504, affirmed 5 Cir., 181 F.2d 1; Heiman v. Pan American Life Insurance Co., 1935, 183 La. 1045, 165 So. 195; Ardoin v. Great Southern Life Insurance Co., 1937, 186 La. 583, 173 So. 112; Muse v. Metropolitan Life Insurance Co., 1939, 193 La. 605, 192 So. 72, 125 A.L.R. 1075; Powell v. Liberty Industrial Life Insurance Co., Inc., 1941, 197 La. 894, 2 So.2d 638; Garrell v. Good Citizens Mutual Benefit Ass'n, Inc., 1943, 204 La. 871, 16 So.2d 463; Quinones v. Life & Casualty Insurance Co. of Tennessee, 1945, 209 La. 76, 24 So.2d 270; Stanley v. Cryer Drilling Co., 1948, 213 La. 980, 36 So.2d 9; Robbert v. Equitable Life Assurance Soc. of United States, 1949, 217 La. 325, 46 So.2d 286; Moll v. Mutual Health Benefit & Accident Ass'n, 1953, 223 La. 511, 66 So.2d 320; LSA–C.C. art. 1958."

As stated in our ruling on the first defense, the weight of the medical evidence shows that, because of the apparently complete recovery made by Mr. Pipes from his first attack in May, 1953, he probably sustained a new infection, producing a new disability, in late 1954 or early 1955, more than a year after the policy date. Even if this was not so, by resolving, as we must, the policy's ambiguities against defendant, it is our opinion that the "cause" of his "sickness" producing "loss of time" originated more than 15 days after the policy date, so as to afford the coverage claimed.

Dr. Liles testified that there are three stages of nephritis. These are called, in medical terminology, the acute, sub-acute and chronic stages, in each of which the symptoms vary. In the acute stage they are very abrupt in onset and the patient is quite ill, having pain, headaches, and swelling of the face, feet and hands, with elevated blood pressure, as well as blood casts and albumen in the urine. Most people recover from acute nephritis. If they do not, they go into the sub-acute phase, where the symptoms are less intense, with the laboratory and clinical findings being of a lesser degree. This phase may last for several months, or even a year or two, when recovery may ensue. A certain percentage of patients go into the chronic stage and gradually become worse until they die. Death can result from any of the stages. When Dr. Liles first examined Mr. Pipes on May 3, 1955, he diagnosed his condition as "glomerulonephritis, chronic, active (possibly sub-acute)". When Dr. Ferris examined him at various times in 1953, he was unable to determine which stage was present.

From this review of the medical evidence it is apparent that no one knows with a reasonable degree of certainty, not even the doctors, from what stage of the disease Mr. Pipes suffered in the middle of 1953, or whether or not he had

made a recovery by November 18, 1953, the policy date. Since the claim of lack of policy coverage is also a special defense, the burden of proving exclusionary facts rests upon defendant.[11] That burden has not been carried successfully, for the "cause" of Mr. Pipes' total disability, which did not begin until late May or early June, 1955, has not been shown with reasonable certainty to have antedated December 2, 1953, which was 15 days after the policy date.

State Mutual Life Assur. Co. of Worcester, Mass. v. Heine, 141 F.2d 741, 745, is a case remarkably similar to this one in its facts and policy language, having been decided by the Sixth Circuit Court of Appeals in 1944. There the insured held a policy providing for benefits in the event of disability, the "cause" of which was "sustained or contracted after the date of the policy". He became disabled from locomotor ataxia and made claim against his insurer. A main defense was that the "cause" of his disability had not occurred after the policy date because he had suffered from syphilis, which brings about locomotor ataxia, for many years before the policy was issued. In other words, just as here, the insurer contended that there was no coverage and that the policy, as to that disablement, was void *ab initio*. Rejecting this defense, and affirming the lower Court's holding of liability, the Court stated:

> "The contract limited the liability of the insurer to such disability, or the cause thereof, as was sustained or contracted after the date of the policy. Viewing the contract as a whole, the loss insured against was a disability arising from an accident or disease. *The ultimate facts show that the 'cause' (giving that word its ordinary meaning) of insured's disability occurred after the date of the policy.* Locomotor ataxia is a successor of luetic infection, the lat-

11. Telford v. New York Life Insurance Co., supra; Mataya v. Delta Life Insurance Co., supra; Bankson v. Mutual Benefit Health & Accident Ass'n, supra.

ter being the precursor of the former. It is generally recognized by neurologists that only persons who are victims of acquired or hereditary syphilis are subject to locomotor ataxia, but not all syphilitics have this disease. While locomotor ataxia is an offspring of syphilis, it is a distinct disease. According to the testimony of the doctors, locomotor ataxia has three different stages; (1) The pre-ataxic, (2) the ataxic, (3) complete paralysis. The first stage may be prolonged without substantial disablement and the patient may die from intercurrent complications without being ataxic. The second stage has symptoms entirely distinct from the first and its peculiar characteristics are difficulty in walking in the dark and a swaying of the body when the eyes are shut. *It is clear from the evidence that at the time the policy in question was issued, insured was suffering from the first stage of the disease, but that he had sustained no disablement therefrom.* The second, or ataxic, stage was reached after the policy was issued with the resulting disablement.

*"The word 'cause' has many meanings and shades of meanings. Philosophically speaking, the sum of all the antecedents of any event constitutes its cause. As a rule, however, each separate antecedent of an event is considered as a cause for that event and no other. Ordinarily, that condition is usually termed the cause whose share in the matter is most conspicuous and is the most immediately preceding and proximate to the event. In other words, that which brings a thing to be; that condition which determines the final result.*

*"The insurer did not insure appellant against a disease, but against disablement from a disease.* The immediate cause of insured's disability was his affliction of locomotor ataxia in its second stage. *It is true that such stage would not have been reached but for the existence of the first stage of the disease,* which latter stage could have continued throughout assured's lifetime without disablement."

When Dr. Liles was on the witness stand, we told him about this decision and read to him that Court's definition of "cause", then asking his medical opinion as to when the "cause" of Mr. Pipes' disability originated. His answer was that "heart failure" was the cause of his total disability, evidently beginning not long prior to his first examination on May 30, 1955.

On the basis of all we have observed— the medical opinion just mentioned, the liberal construction of the policy provisions which we ought to, and do, apply in order to effectuate, rather than negative, the dominant purposes of the policy in its provisions for disability coverage, and upon the authority of the sensible reasoning of the Court in Heine—we must find that the second defense here presented also is without merit.

For these reasons, accordingly, we find for plaintiffs on the basic claim. Because we further find that the denial of liability and refusal to pay the benefits which were due, within the 30-day delay from receipt of proof, provided by LSA–R.S. 22:657, was arbitrary and unreasonable, plaintiffs also will be awarded judgment for the full penalty provided, including the agreed attorney's fee of $1,500.

Proper decree should be presented for signature.