113 So.2d 56 (1959)
Wallace R. CARRUTH et al., Plaintiffs-Appellants,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellee.
No. 9014.
Court of Appeal of Louisiana, Second Circuit.
May 27, 1959.
Rehearing Denied July 3, 1959.
Writ of Certiorari Denied October 7, 1959.
*57 Gravel, Humphries, Sheffield & Fuhrer, Alexandria, for appellants.
Gist, Murchison & Gist, Alexandria, for appellee.
GLADNEY, Judge.
This is a suit for damages arising from an intersectional automobile accident that occurred April 17, 1957, in Alexandria, Louisiana. Made defendants were Ronald W. Hinkley and his alleged insurer, State Farm Mutual Automobile Insurance Company. Hinkley, who was absent in the military service, allowed judgment by default to be rendered against him, and he has not appealed. The insurance company defended the action on the ground its policy issued to Hinkley was voided for material misrepresentations made in the application for insurance. Pleading alternatively, it denied Hinkley was guilty of actionable negligence and specially averred the contributory negligence of Mrs. Carruth as a bar to recovery. After trial, the district judge held negligence of Hinkley was the sole proximate cause of the accident and denied the plea of contributory negligence, but he sustained the policy defense and rejected the demands against respondent company. Plaintiffs appealed.
The evidence discloses on the afternoon of April 17, 1957, Mrs. Carruth was driving a new Chevrolet on Rapides Avenue, a right-of-way street, in a southerly direction, and was proceeding in her proper traffic lane at a speed of about fifteen miles per hour as she approached the "T" intersection of Rapides and Westwood Avenues. She testified she observed Hinkley approaching rapidly from her left on Westwood but that as he neared the intersection he appeared to slow down and she thought he would stop, but he did not, and in attempting a right turn he drove beyond the midline of Rapides Avenue, and collided with the Carruth vehicle. The only eyewitnesses to the collision were the two drivers and Autrey E. Herrington, a passenger in the car of Hinkley.
*58 The negligence of Hinkley is so clear the point is not seriously raised in the brief of appellee insurer. The record convicts Hinkley of actionable negligence in several particulars, viz.: failure to yield the right-of-way, failure to keep a proper lookout, failure to maintain control of his automobile, and in driving on the wrong side of the street upon making a right turn into an intersection.
Appellee asserts though that Mrs. Carruth was guilty of contributory negligence in failing to bring her vehicle under proper control and thereby avoid a collision after she saw Hinkley approaching the intersection at a fast rate of speed. We find this charge is not proven. The evidence shows that as Hinkley neared the intersection he slackened his speed and then drove out into the intersection. Herrington testified Hinkley did stop and thereby he affirms the testimony of Mrs. Carruth that Hinkley did reduce the speed of his car. When the collision appeared imminent Mrs. Carruth applied the brakes on her car and turned it to the right in an effort to avoid an accident. Also an important factor is that the point of impact occurred well over in the west (Mrs. Carruth's) lane of traffic, a fact borne out by the finding of physical evidence thereof consisting of broken glass, mud and a piece of chrome from Hinkley's car. That this debris was located from four to five feet beyond the center of the street was attested to by Officers Heath and Hathorn of the Alexandria police force and by Mr. Carruth.
The principal and crucial issue is whether the policy was vitiated by virtue of material misrepresentations made by the stated insured for the purpose of obtaining the insurance. The facts unquestionably disclose Hinkley falsely answered questions by the company representative relating to his occupation and whether or not he was a member of the armed forces. This is reflected in a written statement he made on August 8, 1957, wherein he relates what transpired when the policy was written, saying:
"A couple of days later Mr. Thompson and another man with State Farm came out. Mr. Thompson did most of the talking; he asked my age. I told him I was 21; if I was married and I told him `no'. He asked me what my occupation was. I told him I was discharged from the service; he asked me what I did before I went into the service. I told him I was a painter, and that I had not been able to get a job. I told him that if I did not get a job real soon I was going back in the service. I was in the service already, however. There had been two or three people, I do not recall their names, anyway, they told me if State Farm or any other company knew I was in the service, they would not write liability insurance for me; that's the reason I did not tell them I was in the service, so I could obtain liability insurance on my car. I was asked directly by Mr. Thompson if I was in the service or not, but I told him `no'. * * *"
The testimony of Schrader and Thompson fully affirms the truth of the facts contained in the statement of Hinkley. Although questioned in the brief of appellants, the record proves beyond reasonable doubt the agents of State Farm Mutual Automobile Insurance Company did not know Hinkley was in the military service when the policy was written on April 3 1957, and that if they had been so informed the policy would not have been written. In truth, the company was not cognizant of the misrepresentation until it became engaged in investigating the accident. It also learned at that time the named insured had left Alexandria in response to military orders and despite diligent effort the insurer was unable to contact Hinkley until August 8, 1957. On the latter date the defendant company obtained the above quoted statement admitting the misrepresentation and also a "reservation of rights" *59 letter releasing the insurer from any waiver of right to claim a forfeiture of the in insurance contract should the company continue to negotiate with the claimants.
It is argued, however, that even if it be conceded misrepresentations were made with an intent to deceive the insurer for the purpose of obtaining the insurance, the latter has failed to sustain the burden of proving the representation was material to the risk. Specifically, the argument challenges the position of the insurer that the hazard of writing automobile liability insurance of persons in the military service is attendant with greater hazard than the insuring of civilians.
It is, of course, essential to the validity of a contract that the parties thereto give their consent. LSA-Civil Code, Article 1800 declares as to the contract, consisting of a proposition and the consent to it, the agreement is incomplete until the acceptance of the person to whom it is proposed. The Code also prescribes, Art. 1818:
"Where the law does not create a legal presumption of consent from certain facts, then, as in the case of other simple presumptions, it must be left to the discretion of the judge, whether assent is to be implied from them or not."
In the absence of statutory provisions to the contrary, insurance companies have the same right as individuals to limit their liability, and to impose whatever conditions they please upon their obligation, not inconsistent with public policy; and the courts have no right to add anything to their contracts or to take anything from them. Muse v. Metropolitan Life Insurance Company, 1939, 193 La. 605, 192 So. 72, 75, 125 A.L.R. 1075; Kennedy v. Audubon Insurance Company, 1955, La. App., 82 So.2d 91.
The effect of misrepresentations by an applicant for insurance is regulated to a certain extent by the Insurance Code of this state, particularly LSA-R.S. 22:619, which reads as follows:
"§ 619. Warranties and misrepresentations in negotiation; applications
"A. Except as provided in Sub-section B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
"B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."
The intent of the Legislature in the enactment of the above statute received the attention of the Supreme Court in Roche v. Metropolitan Life Insurance Company, 1957, 232 La. 168, 94 So.2d 20, 21, wherein it commented:
"The instant contract was confected prior to the adoption of Act 195 of 1948, the Insurance Code of Louisiana (now incorporated in the Revised Statutes as R.S. 22:1 et seq.), and the law applicable is set out in Act 52 of 1906, as amended by Act 227 of 1916. A purpose of this and enactments of other states containing similar provisions was to abolish the highly technical doctrine of warranty, the intent of the Legislators being to transform a warranty into a representation, thus *60 saving a policy of insurance from forfeiture for false statements contained therein unless they are found to be material or fraudulent. See Vance, Handbook of the Law of Insurance (3rd ed. 1951) 417, Sec. 74. In Goff v. Mutual Life Ins. Co. of New York, 131 La. 98, 59 So. 28, this Court commented on the difference between warranties and representations, observing that in the case of the latter, their falsity does not vitiate the policy unless material, and that a statement, in an application for life insurance to be material, must have been an inducement to the contract. See 45 C.J.S. Insurance § 595d(3), p. 406; 29 Am. Juris. 422, Insurance, Sec. 524; annotation, 63 A.L.R. 846 et seq., in particular at 854, subdivision `n'; annotation 131 A.L.R. at 617 et seq.; Rhodes v. Metropolitan Life Ins. Co., 5 Cir., 172 F.2d 183.
"The rule universally obtaining is clearly and succinctly stated in 45 C. J.S., op. cit. supra, thus: `To avoid a policy on the ground of false representation, the representation ordinarily must relate to a matter material to the risk, the test of materiality being whether knowledge of the facts would have influenced the insurer in determining whether to accept the risk or in fixing the amount of premiums. In the absence of statute, a causal connection between the facts misrepresented and the death of the insured is not necessary to establish the right to forfeiture.'"
It is obvious that subsection A of Section 619 embraces automobile liability insurance, whereas subsection B applies only to life or health and accident insurance. However, the difference is of no importance as to the case under review. We are concerned herein with the question of whether the representation was material to the insurer and we are of the opinion if the matter affected the acceptance of the risk it should be considered material. In 45 C.J.S. Insurance § 473(4), pp. 177, 178, appears the following comment:
"A material matter is one which probably will affect the decision of the company as to the making of the contract or as to its terms. The question of what is a material representation is not affected by the causes which in fact lead to the loss. A representation may be made material by the agreement of the parties, as where it is stipulated that the policy shall be void in the case of any misrepresentation whatever.
"Effect of inquiry. The fact that the company makes a specific inquiry of insured as to a particular matter establishes its materiality. Although the answer to a question asked by insured may not be material in itself, it may be rendered material by the fact that the effect of the answer is to prevent the company from pursuing inquiry as to material matters."
Counsel for appellants point to the opinion of the district court and say it erred in its conclusion the mere showing that Hinkley was in a prohibited category was in and of itself proof of the materiality of his misrepresentation. It is earnestly contended the law is otherwise and requires the insurer to introduce good and competent evidence to prove that its risk is materially affected by the misrepresentation. In support of the position so taken, counsel rely strongly on Pipes v. World Insurance Company of Omaha, D.C., 150 F. Supp. 370, affirmed 5 Cir., 255 F.2d 464, hereinafter discussed.
The policy issued to Hinkley contained declarations agreed to by the insured wherein (Item 1) he gave his address as Route 1, Alexandria, Louisiana, his occupation as a painter, and stated "the owned automobile will be principally garaged in the above Town * * *." The policy provided further: "By acceptance of this policy, the insured named in Item 1 of the *61 Declaration agrees that the statements in the declaration are his agreements and representations, that this policy is issued in reliance upon the truth of such representations * * *."
The respondent insurer filed in evidence its printed underwriting instructions to its agents relative to granting insurance to military personnel. These are comprehensive and undoubtedly were thoughtfully and seriously compiled by its underwriters. Briefly stated, the instructions disclose that: military risks, as a class, have consistently had much higher than average loss ratios; increased costs are incurred in investigating the risk; rates in effect around most military installations and camps have not been weighted to reflect the density of traffic in the immediate area; short hurried trips home and "share the expense" trips are less favorable to insurers; and losses present more expensive servicing problems. The company therein set out that it recognized its obligation to service present policy holders and members of their families called into the armed services, but did not recognize the same obligation towards those in the armed forces who as civilians were not insured by the company. Some exceptions were spelled out for applicants which permitted eligibility. Thereunder military personnel could qualify if a son, daughter, husband or wife of a policy holder, provided such person was in the original draft or first enlistment period, was a member of the household of an active policy holder, and an "Inquiry Form and Supplementary Report for Military Personnel" is first submitted and approved. Hinkley was not eligible under any of the exceptions listed.
For as much as it is seriously argued Pipes v. World Insurance Company of Omaha, supra, should have an important bearing on the outcome of this case, we have studied the effect of its holding. The deceased Pipes, in making application for a health and accident policy, answered the question whether he had ever had kidney disease by stating: "Yes,albumen, July 1953, no after effects." Medical testimony given upon the trial was conflicting as to whether the applicant knew or should have known he was suffering from Bright's Disease; or whether he had recovered to the extent he believed he had "no after effects". In rejecting the contention of the insurer, Judge Dawkins of the Federal District Court, opined:
"In evidence is the deposition of R. A. Kuran, Secretary and Chief Underwriter of the Accident and Health Department of World Insurance Company. He testified, in effect, that the policy was issued in complete reliance upon the answers to the questions in the applications, and that it would not have been issued if the company had known Mr. Pipes was suffering from nephritis, or Bright's disease. In other words, he concluded that these answers were false in their entirety and materially affected the acceptance of the risk and the hazard assumed by defendant.
"His self-serving conclusion, however, is not the true test of the materiality of such statements, either generally, or within the terms of LSA-R.S. 22:619, subd. B. The proper test for determining materiality is whether reasonably careful and intelligent underwriters would have regarded the answers as substantially increasing the chances of a loss upon the risk insured against, so as to cause rejection of the application, or the charging of an increased premium. Decision on this question may not be left to the self-interested determination of the insurer after loss has occurred, i. e., the matter is not one to be settled by the mere pronouncement of the insurer. The misrepresentation, if any, must be of such character that the Court itself can say it reasonably would have misled the underwriter's judgment as to the nature of the risk or amount of premium." [150 F.Supp. 377.]
The Fifth Circuit United States Court of Appeals sustained Judge Dawkins in this *62 regard, using the following language in its opinion reported in 255 F.2d 464, 468:
"Materiality cannot be settled by a post-mortem pronouncement of the insurer who is sued for not paying the insured's claim. It is for the court to say whether the matter allegedly misrepresented would affect a reasonable insurer's judgment as to acceptance of the risk. Here, the words `No after effects', written November 18, 1953, cannot be divorced from the rest of the answer admitting kidney trouble and stating `Albumen, July 1953'. It is a common knowledge, backed up by testimony in the record, that a reference to albumen in an insurance examination or application triggers a triple alert to insurance companies. This is the important material fact in the application. Pipes' honest answer to Question 12 was all the disclosure necessary for any reasonable underwriter to accept the risk or to investigate further."
Both courts held, therefore, the answer was honestly made and was sufficient to alert the insurer and require it either to then accept the risk or to investigate further, and when the company failed to make additional inquiry, it was assumed to have accepted the risk. As we view the decision it did not turn upon whether there was a material misrepresentation, but whether the insurer actually waived a material matter which had been disclosed by a truthful answer. The ruling in the cited case does not, therefore, rest upon the materiality of a false representation as presented in the case at hand, and consequently, the Pipes case is inapposite.
We have no hesitancy in concluding the representation by Hinkley was material, was false, and made with intent to deceive for the purpose of securing insurance which otherwise would have been denied.
Appellants in further argument insist the insurer by its conduct has waived any right to insist upon a forfeiture of the policy and refer to the general rule as stated in 45 C.J.S. Insurance § 672:
"An insurance company may waive, or be estopped to assert, a ground for avoidance or forfeiture of an insurance policy, and the courts are prompt to seize on any circumstances which indicate a waiver on the part of the company or which will raise an estoppel against it."
The same authority, 45 C.J.S. § 673, declares that though in the law of insurance the terms "waiver" and "estoppel" are frequently used as interchangeable, technically a distinction exists between the terms and "waiver, unlike estoppel, may arise from the act of the company only and without the insured having been misled to his injury".
The following circumstances are recited as indicative of conduct by the respondent insurer as constituting a waiver of any right to repudiate the policy and as constituting an estoppel against the company: Thompson knew Hinkley was in the military service within a few days after the accident on April 17th, if he did not, in fact, know this when the policy was written on April 3rd; a letter of Louis Ulmann, an adjuster for the company, dated June 12, 1957, addressed to George P. Brown, Jr., Superintendent of Claims for the company, requested "a reservation of rights letter" be sent to the named insured because of information indicating a misrepresentation; that after this the insurance company knew Hinkley was in service at the time the policy was written; shortly after the accident Ulmann discussed settlement with the attorneys for the plaintiff and advised them at the time he "wasn't even too sure coverage existed"; in July statements were taken from Mr. and Mrs. Hinkley; a company representative arranged for an examination of Mrs. Carruth by Dr. Hardy (this examination took place on August 8, 1957); on August 8, 1957, the defendant obtained the "reservation of rights" letter and a statement *63 from the named insured which informed the latter he was in the military service on April 3, 1957, when he applied for the insurance and deliberately told a falsehood with respect thereto; and, finally, there was a delay until September 30, 1957, before the company issued its letter notifying the named insured that his policy was canceled and a refund of the premium was made.
The facts listed above are substantiated by the record. However, it is important to observe the record contains no proof Thompson or any other representative of the company knew of the misrepresentation made to obtain the policy until after the accident had occurred and investigation was under way. The evidence also shows the company was diligent in its search for Hinkley but did not locate him until August 8, 1957, at which time it obtained the statement from him admitting the misrepresentation and also the letter granting permission to continue its investigation of the accident, without a waiver of its right to a forfeiture of the policy. Had the company been in a position to immediately communicate with the named insured and then failed to secure a "reservation of rights" letter, its course of conduct thereafter might be construed as constituting a waiver of its right to rescind the policy. We think it important to note that in the instant case the accident had already occurred prior to the knowledge of the misrepresentation and investigative action thereafter did not prejudice any right of the named insured. It is reasonable, in view of our laws which penalize an insurer for not acting quickly and discreetly to perceive the company's action was prudent in requiring some evidence of forfeiture from the insured before it either refused to defend Hinkley or attempted to abrogate its contract. These circumstances, we think, resolve the questions of waiver and estoppel in favor of the defendant.
Our findings as set forth above have resulted in exoneration of the insurance company of any liability to plaintiffs. The orders of appeal taken herein, although foreclosing further inquiry into the issue of negligence, raise the question of quantum.
Mrs. Carruth received injuries which she testified caused chest pain, and bruises on the right shoulder, left breast, right hip, legs and tops of her feet. She received medical attention from Dr. Robert B. Wallace, Jr., her personal physician, on the morning following the accident and when the bruised condition of her breast progressively got worse, upon advice of her doctor, she underwent surgery for the removal of the left breast. Following the operation she said she became so extremely nervous she required hospitalization to relieve the condition.
The trial court rendered judgment in favor of Walter R. Carruth in the sum of $804.26 for special damages and in favor of Mrs. Lois Sandell Carruth in the sum of $4,000 for personal injuries. After a careful examination of the evidence we have concluded the awards made in favor of plaintiffs are neither inadequate nor excessive, and finding no manifest error therein, we approve of the allowance made by the district court.
For the reasons hereinabove set forth, the judgment from which appealed is affirmed.
HARDY, J., dissents from the judgment of the court as to the quantum, being of the opinion that the award in favor of the plaintiff, Mrs. Carruth, should be increased.